# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-0380 C/W 09-0381 - WCA


**IBERIA MEDICAL CENTER**

**VERSUS**

**WENDY WARD**


************

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 4
PARISH OF LAFAYETTE, NO. 06-06495 C/W 06-06990
HONORABLE SAM LOWERY
WORKERS' COMPENSATION JUDGE

************

## JIMMIE C. PETERS
## JUDGE

************

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and J. David Painter, Judges.


**AFFIRMED AS AMENDED AND RENDERED.**

**Christopher R. Philipp**
**Attorney at Law**
**P. O. Box 2369**
**Lafayette, LA 70502**
**(337) 235-9478**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    Wendy Ward

**C. Shannon Hardy**
**Penny & Hardy APLC**
**P. O. Box 2187**
**Lafayette, LA 70502-2187**
**(337) 231-1955**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    Iberia Medical Center

PETERS, J.

These consolidated cases arise from a workers' compensation claim by Wendy Ward against her employer, Iberia Medical Center (Iberia Medical). Ms. Ward claims to have injured her left hand in a work-related incident on Friday, February 3, 2006. The matter is now before us because Iberia Medical has appealed a judgment in favor of Ms. Ward awarding her indemnity benefits, medical treatment, penalties, and attorney fees; and Ms. Ward has answered the appeal seeking an award of attorney fees on appeal. For the following reasons, we affirm the judgment of the workers' compensation judge (WCJ) as amended and render judgment in favor of Ms. Ward for the additional sum of $5,000.00 as attorney fees associated with the work performed on appeal.

## DISCUSSION OF THE RECORD

Ms. Ward was displaced by Hurricane Katrina from the New Orleans, Louisiana area to the New Iberia, Louisiana area in August of 2005. In December of 2005, she applied for work at Iberia Medical and was hired as a relief food service worker. She claims to have suffered a work-related injury to her left hand on February 3, 2006, while she and a co-worker, Joy Erikson, were attempting to move a large food cart into the service elevator at the medical facility. According to Ms. Ward, as she attempted to enter the service elevator, the cart's wheels became stuck in the gap between the sill at the opening of the elevator door and the sill of the elevator car. She claimed in her pleadings that she injured her hand when it "got caught in the elevator." She immediately informed Ms. Erikson of her injury. Ms. Erikson testified that she observed Ms. Ward's swollen hand, and urged Ms. Ward to report the accident and to seek medical attention at the emergency room.

Ms. Ward took Ms. Erikson's advice and immediately reported the incident to her supervisor, Annie Hines. She and Ms. Hines completed an incident report the same day.[1] With regard to the question in the incident report as to how the accident occurred, the following notation was made: "Pushing lunch cart and Shut Elevator on hand." Concerning the need for medical treatment, the report states that Ms. Ward did not seek medical attention because she "[t]hought It would be okay." Ms. Hines testified that immediately after the accident, Ms. Ward's hand had an abrasion and appeared to be swollen. She encouraged Ms. Ward to go to the medical center's emergency room, but Ms. Ward declined to do so.

When Ms. Ward returned to work on Monday, February 6, 2006, her hand was still swollen. She then sought evaluation by an emergency room doctor at Iberia Medical. The emergency room record recorded Ms. Ward's complaint as "LEFT WRIST & HAND PAIN & SWELLING." The examining physician concluded that Ms. Ward had sustained a contusion to her left hand as a result of her hand being caught between an elevator and a food cart. After administering a drug screen (which was completely normal) and taking an x-ray of the wrist (which revealed no fracture or dislocation), the emergency room physician released Ms. Ward with instructions for her to follow-up with her personal physician and to take Tylenol for pain.

On Wednesday of that same week, Ms. Ward saw her personal physician, Dr. Kimberly Smith. At the time of the office visit, Ms. Ward's hand and wrist were swollen and bruised. According to Dr. Smith's records, the elevator struck Ms. Ward's hand while the palm of her hand was wrapped around the leg of the cart. Dr. Smith gave Ms. Ward an "EXCUSE SLIP" from work for the period from February

---

[1]Although Ms. Ward signed the report, Ms. Hines provided the handwritten information in the report.

2

8, 2006, through February 13, 2006. She later issued a second and third "EXCUSE SLIP" extending that period, first to February 24, 2006, and then to March 6, 2006.

When Ms. Ward's condition failed to improve, Dr. Smith referred her to Dr. Andre Cenac, a New Iberia, Louisiana orthopedic surgeon. Dr. Cenac first examined Ms. Ward on March 15, 2006, and continued to follow her medically thereafter. In his initial evaluation, Dr. Cenac observed that Ms. Ward had a deep contusion to her left hand with swelling and limited range of motion. He recommended physical therapy and pain medication. When he saw her again on April 12, 2006, Dr. Cenac found that her condition had not changed and recommended continuing the previously prescribed medical management. Because she continued to have no use of her left hand, he released her for, at best, light duty. Nothing had changed in the June 19, 2006 evaluation, and Dr. Cenac suggested that Ms. Ward undergo some additional medical tests to further evaluate his determination that she was possibly suffering from reflex sympathetic dystrophy, a nerve type of pain which can be attributable to a trauma. At this time, Dr. Cenac still was of the opinion that Ms. Ward was not employable in her prior position. However, the diagnostic tests suggested by Dr. Cenac were never performed.

In a December 14, 2006 letter addressed to HSLI, Iberia Medical's workers' compensation administrator, Dr. Cenac had completely changed his mind concerning Ms. Ward's condition and stated that "I am in agreement with the recommendation [by Dr. E. Scott Yerger] of positive maximum medical improvement and return to regular duty." Dr. Cenac last saw Ms. Ward on April 18, 2007. His report concluded that, despite a continued history of persistent pain and swelling, Ms. Ward suffered from no significant abnormalities.

3

In his testimony, Dr. Cenac acknowledged that his opinion changed between June and December of 2006 because of a surveillance video he received from representatives of Iberia Medical. This video was filmed over a period from March 2, 2006, through August 8, 2006, then reduced to the ten-minute segment and shown to the doctor.[2] It purported to show Ms. Ward performing tasks not consistent with her medical complaints. Despite changing his mind concerning diagnosis and Ms. Ward's ability to return to work, Dr. Cenac still was of the opinion that Ms. Ward had sustained a contusion to her left hand based on her objective signs of swelling of the hand and wrist. He was also impressed with the fact that Dr. Smith had seen such significant swelling as to refer Ms. Ward to him for evaluation. That, he explained, gave credibility to the existence of a significant traumatic event causing an injury.

At the request of Iberia Medical, Ms. Ward was also seen by Dr. E. Scott Yerger, a Lafayette, Louisiana orthopedic surgeon. Dr. Yerger first examined Ms. Ward on August 2, 2006. Following his examination, he was provided by Iberia Medical with not one, but two surveillance videos.[3] Dr. Yerger found the content of these videos to be "impressive" in that it showed Ms. Ward doing things with her left hand that were "contraindicative" to what he saw in his office. Specifically, her

_____

[2]Despite the long period of time over which Ms. Ward was observed by the individual or individuals taking the surveillance video footage, that which was shown to the WCJ at trial begins with a July 13, 2006 segment at 6:34 p.m. that shows Ms. Ward at her apartment picking up a mop with her right hand and opening a door with her left hand; shows her leaving the apartment at 7:18 p.m. carrying a cup of coffee in her right hand and switching it to her left hand; a moment later returning to her apartment and, after shifting the coffee cup back to her right hand, swinging her left arm in a normal fashion without any guarding effort; then going to a store and ultimately exiting the store at 7:39 p.m. with a newspaper in her left hand. The next segment was filmed on July 24, 2006, beginning at 10:57 a.m., and initially shows Ms. Ward pushing the door of her apartment open with her left hand. She is next seen opening the door with her left hand at 11:01 a.m. Next, at 11:19 a.m., she is seen walking out of her apartment adjusting her robe with her left hand. Next, at 11:21 a.m. and 11:24 a.m., she is seen opening the door of her apartment with her left hand. Finally, at 11:26 a.m., she is seen sitting in a chair in front of her apartment with her left hand in her lap.

[3]One was provided to him on July 13, 2006, and the other on July 24, 2006.

4

activities did not match with his provisional diagnosis. His summary of Ms. Ward's condition is as follows:

> I do believe she suffered a contusion to the left hand and wrist when she had her left hand caught in the door of an elevator, between the elevator and the food cart that she was pushing in a hospital, but it would be difficult for her to have a Complex Regional Pain Syndrome of her left upper extremity involving the left hand and wrist and still be able to perform the activities that she was doing on these videos. In light of these surveillance videos, I think she's able to return to work at her prior position as a food service worker and that she had likely reached maximum medical improvement.

In other words, both Dr. Cenac's and Dr. Yerger's final conclusion concerning Ms. Ward's physical condition rested solely on the credibility of the surveillance video[s] and not on any medical findings associated with their individual examinations of their patient.

Based on Dr. Yerger's conclusion that Ms. Ward had reached maximum medical improvement, Iberia Medical terminated her indemnity benefits as of September 5, 2006. Ms. Ward never returned to her position with Iberia Medical.

On September 18, 2006, Iberia Medical filed a disputed claim for compensation alleging not only that Ms. Ward was capable of returning to regular work duties, but that she had forfeited her right to receive workers' compensation benefits based on her fraudulent actions in providing misleading information pertaining to her injury and medical condition. On October 10, 2006, Ms. Ward filed a separate disputed claim based on Iberia Medical's failure to pay indemnity benefits, to authorize medical treatment, to correctly calculate her workers' compensation rate, and for the premature termination of her indemnity benefits. The WCJ consolidated these two claims for trial.

5

Following a trial on the merits, the WCJ rendered oral reasons in which he found that Ms. Ward suffered a work-related accident, awarded her temporary total disability (TTD) benefits for February 6 thorough 10, 2006, reinstated her TTD benefits as of September 6, 2006, and awarded her $8,000.00 in penalties and $14,667.65 in attorney fees based on Iberia Medical's arbitrary and capricious termination of her indemnity benefits.

Iberia Medical has suspensively appealed the WCJ's judgment, raising five assignments of error:

I.    The trial court erred by determining that Ward sustained a work injury when her trial testimony was diametrically opposed to her prior sworn testimony and the physical evidence established that Ward's testimony regarding how the accident occurred was an impossibility.

II.    The trial court erred by determining that Ward was entitled to the reinstatement of temporary total disability benefits after September 6, 2006 when every doctor testified she was capable of returning to her prior employment by that date and there was no medical evidence submitted contradicting the doctor's [sic] opinions.

III.    The trial court erred in ruling that Iberia Medical acted in an arbitrary and capricious fashion and improperly terminated Ward's benefits when the doctors provided opinions that Ward had misrepresented her physical and medical condition and was capable of returning to work prior to that date and there was no medical opinion or testimony that Ward was not capable of returning to work after that date.

IV.    The trial court erred in awarding penalties and attorney's fees.

V.    The trial court erred in failing to find that Ward had willfully made a false statement or representation for the purpose of obtaining benefits or payments thereby entitling Iberia Medical to a judgment for the amounts previously paid.

Ms. Ward answered this appeal seeking additional attorney fees for work performed on appeal.

6

## OPINION

### *Assignments of Error Number I and V*

Because both of these assignments of error relate to the particulars of the accident itself and the factual record in general, they will be considered together.

Louisiana Revised Statutes 23:1021(1) provides that an accident is "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La.R.S. 23:1021(1). Proof on this issue is by a preponderance of the evidence. *Bruno v. Harbert Int'l Inc.*, 593 So.2d 357 (La.1992). Additionally, an employee's testimony alone may be sufficient to discharge this burden, provided that (1) no other evidence discredits or casts serious doubt upon his or her version of the incident, and (2) his or her testimony is corroborated by the circumstances following the alleged incident. *Id.* In determining whether the employee has discharged his or her burden of proof, the WCJ should accept as true a witness's uncontradicted testimony, even though the witness is a party, absent circumstances that cast suspicion on the reliability of that testimony. *Id.* Further, the WCJ's determinations on whether the employee's testimony is credible and on whether she met her burden of proof are factual findings not to be disturbed on appeal absent manifest error. *Id.*

Louisiana Revised Statutes 23:1208(A) provides in pertinent part that "[i]t shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation." In order to prove fraud as defined by this provision, an employer must prove: (1) a false statement or

7

misrepresentation by the employee, (2) willfully made, and (3) that it was made for the purpose of obtaining workers' compensation benefits. *Campbell v. City of Leesville*, 07-1061 (La.App. 3 Cir. 1/30/08), 974 So.2d 908, *writ denied*, 08-491 (La. 4/25/08), 978 So.2d 366.

The food cart involved in the claimed accident was described in testimony as a five-foot high, heavy stainless steel box on four wheels, with doors at the front and back and a long rod-like handle extending from top to bottom on each corner of the cart. It is wide enough to hold two food trays side by side, and, when loaded, holds approximately thirty trays. At trial, Ms. Ward described how the accident occurred in the following manner:

> Me and another co-worker, which is Joy Erickson, we were going to deliver food trays to the patients because we had to get them out for a certain time, and she and I was pushing the food cart to the elevators. We got to the second floor, and we had delivered all the trays to the second, third, and fourth floor of the hospital. And upon returning back to the first floor where we had to bring the cart back until it was time to go pick up the trays, she and I was pushing the elevator – pushing the food cart into the elevator, and the wheels got stuck in the groove of the elevator. And as we were trying to get it out, the door closed on my hand, on the corner of the food cart and my hand.

Iberia Medical argued at trial, and argues before this court, that Ms. Ward's numerous versions of how the accident occurred precludes any trier of fact from finding that she established the occurrence of an accident by a preponderance of the evidence. Admittedly, her testimony on this point is less than clear. As seen from the testimony set forth above, Ms. Ward testified at trial that she was pushing the cart onto the service elevator when the accident occurred. However, in her June 2007 deposition, Ms. Ward testified that the accident occurred while she and Ms. Erikson were retrieving trays from either the second or third floor— not while loading the cart on the first floor—and that she was pulling the cart inside the elevator, not pushing

8

the cart. Because the elevator door opened and closed from the left side, Iberia Medical contends that the elevator door would not have struck her left hand had she been pulling the cart instead of pushing it and that she changed her testimony to comport with the physical evidence. When questioned at trial about these conflicts in her testimony, Ms. Ward acknowledged that for her left hand to have been struck by the elevator door, she would have had to have been pushing the cart into the elevator, but she claimed that when she gave her deposition testimony, she was not really thinking about the details of the accident.

Ms. Erikson's testimony did not support Ms. Ward's trial testimony on the pushing/pulling issue. According to Ms. Erikson, when the accident occurred, Ms. Ward was pulling the cart into the elevator as she [Ms. Erikson] pushed it from behind. Additionally, Ms. Erikson did not observe the cart's wheels becoming stuck in the elevator door gap and suggested that this was not possible given the large size of the wheels when compared to the narrow gap. Ms. Erikson also questioned whether the elevator door could have jammed Ms. Ward's hand given the fact that the elevator had a safety sensor which caused the door to stop when someone crosses the threshold. She was unaware of any instance where the sensor malfunctioned.

Other instances in the record that Iberia Medical suggests give cause to question Ms. Ward's credibility include the following:

- Ms. Ward testified that she learned of the position at Iberia Medical from her cousin while her job application states that she became aware of the position through the food stamp office.

- Ms. Ward, who was hired as a relief worker on an as-needed basis, asserted in her testimony that she thought she had been hired on a part-time basis and only learned of her relief worker status at trial. However, she checked on her job application that she was seeking a "relief" position.

9

- Ms. Ward failed to list her most recent employment on her job application—an eight-year employment with Wendy's Old Fashioned Hamburgers.

- Ms. Ward testified that she was attending courses to complete her high school education at the time of trial. Yet, in her deposition, she testified that she had graduated from New Iberia Senior High School in 1986 and had attended some college.

- When asked in her deposition about prior arrests, she testified that she had been arrested for a domestic disturbance in either 2004 or 2005. However, she admitted at trial that she had been arrested in 2006 for aggravated battery.

- Ms. Ward received unemployment benefits while working for Iberia Medical.

With regard to how she came to know about the job vacancy, Ms. Ward acknowledged that she stated in her job application that she had heard about the job through the food stamp office rather than through her cousin, but did so at the instruction of her cousin who, at the time, was an employee of Iberia Medical. When questioned concerning the discrepancy in her education status, Ms. Ward testified that she did not recall telling anyone in her deposition that she had graduated from high school. She again stated that she had gone to college, explaining that she had attended Baytown Technical College in Waco, Texas. In explaining her failure to mention her 2006 aggravated battery arrest, Ms. Ward stated "I mean, I don't remember everything that goes on in the past thirty, forty years of my life. I don't think anyone does remember every detail of their life." With regard to her receiving unemployment benefits while working for Iberia Medical, Ms. Ward testified that an employment office employee had described the benefits as supplemental pay for the hours she did not work in New Orleans because of Hurricane Katrina.

We must agree with Iberia Medical that Ms. Ward's testimony is filled with contradictions. However, that fact alone does not defeat her claim. Before simply

10

reversing the judgment based on the existence of these contradictions, we must first consider the WCJ's reasons for his decision and apply the manifest error standard to his factual findings. In that regard, it is necessary to reproduce the pertinent provisions of the WCJ's reasons for judgment.

Mrs. Ward was a food service worker at the medical center when on February 3, 2006, a service elevator door shut on her left hand as she was loading a large food cart. She contends that the accident has caused serious, disabling problems to her hand ever since. She asked the Court to find that her injuries arose out of this alleged accident, and as such is entitled to not only reasonable and necessary medical care, but also penalties and attorney's fees for what she terms her employer's improper handling of her claim.

The employer counters with the rather unambiguous argument that Mrs. Ward has either concocted or exaggerated her injuries in an effort to commit fraud. It says it was perfectly justified in terminating her indemnity payments and medical treatment and wants back all of the money it has spent on this matter.

The testimony suggests that after Mrs. Ward allegedly hurt her hand, that she reported the injury to her supervisor, was subsequently treated by a series of physicians, including an orthopedic surgeon, Dr. Cenac, who began seeing her the next month, in March of 2006.

The tipping point seems to have occurred in August 2006, when the insurance adjuster showed Dr. Cenac, the treating physician, and Dr. Yerger, the employer's choice of physician, a video surveillance tape of Mrs. Ward. Apparently, the video had the intended result. Dr. Yerger, who had earlier opined that the elevator door accident had caused Mrs. Ward to develop Complex Regional Pain Syndrome of her left hand and wrist, recommended that Mrs. Ward return to her job. Dr. Cenac agreed.

The insurance company at this juncture took the view that Mrs. Ward never had an accident in the first place; and in any event, she needed to return to work. Workers' Compensation benefits were terminated.

The Court reviewed the video with both counsel and encouraged both to make comments on the record to explain the pictorial evidence. The video surveillance sequences began about 5:30 in the morning on March 2, 2005, and continued sporadically for some seventeen months or so until around 12:00 noon on August 8, 2006. This some year and a half was condensed into about ten minutes of snippets, clips and random shots. Now, I suppose that if any of these flashes in time had

11

shown Mrs. Ward throwing a shot put, operating a jackhammer or something to that effect, it might be a different matter. But instead, we see Mrs. Ward's left hand carrying a newspaper, holding a coffee cup and lifting – not sweeping, just lifting – a broom. That's about it.

The purely unilateral use of video surveillance video, especially one as disjointed, ill-conceived and poorly produced as the one in open court to justify termination of medical treatment and indemnity payments to an injured worker flies squarely in the face of any sense of fair play.

I am hard-pressed to comprehend, much less agree with, the defense's position that it is literally physically impossible for the elevator door to have injured her hand the way she described. The photos submitted into evidence show a very large metal food cart being pushed into an under-sized service elevator door with virtually no visible clearance between the side of the elevator and the cart. Mrs. Ward, who is not particularly articulate, did not describe the mechanics of the accident with any degree of precision; however, she's not required by law to show the exact manner in which her hand was caught. The fact is that her left hand was remarkably functional before she pushed the cart in and was decidedly not thereafter, and she reported this immediately to her supervisor. There's a reasonable presumption here that somehow, someway, the small door and the large cart somehow caused her left hand to get smashed.

Thus, as to the occurrence of an accident, the WCJ concluded that regardless of whether Ms. Ward was pushing or pulling the food cart, or whether she was struck by the closing elevator door or the side of the elevator itself, she sustained a work-related injury. We find no manifest error in that factual finding. No evidence points to a pre-existing injury as hinted to by Iberia Medical. Ms. Ward had worked a significant part of the work day without complaint and immediately complained upon sustaining the injury. Her co-worker had not observed any disability or evidence of traumatic injury prior to Ms. Ward's complaint, but immediately observed that Ms. Ward's hand and wrist had begun to swell. Ms. Ward immediately reported the accident to her supervisor, who also testified that she observed an abrasion on, and swelling of, Ms. Ward's hand. Both specialists who treated her testified that Ms.

12

Ward had sustained a traumatic injury to her hand. The comparative negligence of an employee does not play any part in a workers' compensation claim and, therefore, the mechanics of how the accident occurred, other than for credibility purposes as argued by Iberia Medical herein, are less important than the mere fact that an accident occurred.

With the exception of the surveillance video, the WCJ made no mention of the other inconsistencies complained of by Iberia Medical. Apparently, the WCJ found that either these inconsistences were adequately explained away by Ms. Ward, or they were not relevant to the accident or forfeiture issues. While we might have reached a different conclusion concerning Ms. Ward's credibility given the inconsistencies, we find no error in the WCJ's opposite conclusion in that regard. Assuming for purposes of argument that the inconsistencies were not adequately explained away by Ms. Ward, we do note that all except her criminal history relate to Ms. Ward's attempt to obtain her job in the first place and, except for the credibility issue, do not relate to her workers' compensation claim. Even her inconsistent criminal history statements relate only to credibility.

The one credibility issue that does relate to Ms. Ward's workers' compensation claim is the surveillance video. Despite maintaining surveillance of Ms. Ward for a period of almost six months[4] beginning in March of 2006, the most Iberia Medical could produce was an approximate ten minute segment taken on July 13, 2006 and July 24, 2006, revealing her performing minimal activities and not wearing her

---

[4]The WCJ erroneously concluded in his reasons for judgment that surveillance had begun in March of 2005, not March of 2006. However, this error does not change the WCJ's characterization of the video.

13

compression glove.[5] While obviously impressive to Drs. Yerger and Cenac, the WCJ found the video to be less than convincing. We find no error in the WCJ's conclusion in this regard. *See Fabre v. ICF Kaiser Int'l*, 01-2734 (La.App. 1 Cir. 11/8/02), 835 So.2d 724. Reaching that conclusion, it follows that we find no error in the WCJ's conclusion that Ms. Ward sustained a work-related injury and that Iberia Medical failed to establish that Ms. Ward willfully made false statements for the purpose of obtaining workers' compensation benefits and would, thus, have forfeited her right to receive benefits pursuant to La.R.S. 23:1208(E).

### *Assignment of Error Number II*

In this assignment of error, Iberia Medical argues that the WCJ erred in reinstating Ms. Ward TTD benefits as of September 6, 2006, when both Drs. Cenac and Yerger testified that she was at maximum medical improvement (MMI), and she failed to present any medical evidence contradicting these opinions.

An employee who proves, by clear and convincing evidence, unaided by any presumption of disability, that they are physically unable to engage in any employment as a result of a work-related injury will be awarded TTD benefits. La.R.S. 23:1221(1). Disability can be proven by both medical and lay testimony, and the WCJ must weigh all of the evidence in order to determine whether the employee has satisfied her burden of proof. *Jack v. Prairie Cajun Seafood Wholesale*, 07-102 (La.App. 3 Cir. 10/3/07), 967 So.2d 552, *writ denied*, 07-2388 (La. 2/15/08), 976 So.2d 178. Whether the employee has proven disability is a factual determination that is subject to a manifest error analysis. *Id.*

---

[5]During her August 2, 2006 appointment with Dr. Yerger, Ms. Ward wore a compression glove on her left hand, complained of pain while making a fist and with flexion and extension of her fingers and wrist, and complained of significant pain upon light palpation of her hand.

Ms. Ward testified that she suffers from hand symptoms a majority of the time, and that her hand is very sensitive to hot and cold temperatures. Following her accident, she began wearing a compression stocking glove, but was told by her physical therapist that she did not have to wear it all the time. In fact, she claimed that sometimes wearing the glove makes her hand hurt worse.

According to Ms. Ward, since injuring her hand, much of her daily activity is hindered because of the limitation of use of her left hand. While she used to work in the kitchen, she now has difficulties because she cannot handle pots or dishes with her left hand. At best, she can carry a saucer-sized plate with her left hand. Ms. Ward further testified that she is able to carry a broom, a cup of coffee, and a newspaper, as was shown in the surveillance video. However, she explained that she was encouraged by both Dr. Cenac and her physical therapist to use her hand as much as possible. She stated that she is not capable of performing her position with Iberia Medical because she cannot carry a tray with her left hand and she felt that the heat from the tray would affect her hand.

Ms. Ward also called as a witness Sheila Jacquette, a life-long friend who had grown up with her. Ms. Jacquette testified that between childhood and late 2007, she had no contact with Ms. Ward, but became reacquainted after she found that Ms. Ward had moved into the same neighborhood following Hurricane Katrina. Since their reacquaintance, Ms. Jacquette testified that she has heard Ms. Ward complain of being unable to carry heavy items with her left hand and that her hand is susceptible to hot and cold temperatures. She stated that she actually saw Ms. Ward's left hand swell up on one occasion when Ms. Ward was sitting in a car. Ms. Jacquette testified that she has also seen Ms. Ward shake her hand and complain of stiffness or

15

discomfort in her fingers, and she observed Ms. Ward wearing a compression glove on several occasions.

In this instance, both Drs. Cenac's and Yerger's determination that Ms. Ward had reached MMI and was capable of returning to work was based on the surveillance video and not on an actual physical examination of her hand. Prior to viewing the video, both doctors had restricted Ms. Ward from working. On June 16, 2006, Dr. Cenac noted that Ms. Ward was complaining of continuing swelling in the dorsum of her hand, which caused problems with the flexibility of her hand and the movement of her fingers. Dr. Cenac, based on the fact that Ms. Wards' condition had not improved over time, ordered an EMG and nerve conduction test to determine if she was suffering from reflex sympathetic dystrophy. He restricted her from working. On April 18, 2007, he ordered a triple phase bone scan in order to definitively diagnose her condition. Neither of these tests were conducted.

Dr. Yerger examined Ms. Ward only once, on August 2, 2006. At that time, she complained of pain in her left hand and wrist, numbness in her left long finger, and swelling within her hand and wrist. She stated that her hand felt cool to the touch and was hypersensitive to light touch. On exam, Dr. Yerger noted that Ms. Ward seemed to lack terminal flexion of the PIP and DIP joint of the fingers when making a fist with her left hand. She complained of pain along the dorsal aspect of the wrist and hand while making a fist. Dr. Yerger noted a decrease in the light touch in the tip of the long finger as compared to the other four fingers of her left hand, decreased skin turgor on the left hand and wrist, and the skin of her left hand was duskier in appearance, paler, and cooler to touch than her right hand. Based on his examination and a review of her medical records, Dr. Yerger felt that Ms. Ward had developed a

16

complex regional pain syndrome in her left hand and wrist, which he stated was another name for reflex sympathetic dystrophy.

Unfortunately, both Dr. Cenac's and Dr. Yerger's medical impartiality has been compromised as a result of viewing Iberia Medical's surveillance video. As of the October 15, 2008 trial date, no further medical examination of Ms. Ward had been conducted. Thus, we have no evidence concerning her physical condition past April 18, 2006.

After reviewing the record, we find that it was reasonable for the WCJ to find that Ms. Ward was entitled to TTD benefits as a result of this injury. This is based on the fact that Dr. Cenac found objective signs of swelling in Ms. Ward's hand on a couple of occasions and because he emphasized the fact that Dr. Smith found the swelling significant enough to refer Ms. Ward to him for a consultation. Moreover, until he viewed the surveillance video, Dr. Yerger concurred with Dr. Cenac's findings and recommended that Ms. Ward undergo evaluation by a pain management specialist.

Our difficulty lies in the fact that we are now approximately three years and eight months post-injury and two years and seven months past the last examination of Ms. Ward's hand. However, barring any evidence to the contrary, we find that Ms. Ward is entitled to TTD benefits for eighteen months past February 3, 2006. This period of time accords with Dr. Cenac's testimony that this condition only lasts an average of eighteen months. Should Ms. Ward be able to prove otherwise, she is entitled to revisit this issue before the WCJ. Accordingly, the judgment of the WCJ is amended to reduce the period of time Ms. Ward is entitled to TTD benefits to eighteen months past February 3, 2006.

17

***Assignments of Error Numbers III and IV***

In these assignments of error, Iberia Medical asserts that the WCJ erred in concluding that it was arbitrary and capricious and in awarding Ms. Ward penalties and attorney fees pursuant to La.R.S. 23:1201(1) based on the termination of her benefits. Specifically, Iberia Medical asserts that it acted pursuant to medical opinions that "[Ms.] Ward had misrepresented her physical and medical condition and was capable of returning to work prior to [the date it ceased paying benefits] and there was no medical opinion or testimony that [Ms.] Ward was not capable of returning to work after that date."

In making this argument, Iberia Medical ignores the fact that the medical opinions relied upon to terminate Ms. Ward's benefits were based on its own surveillance video and not any medical evaluation. Additionally, in considering Iberia Medical's attitude toward Ms. Ward's claim from the beginning, we note that she was never paid disability benefits for the week of February 6 through 10, 2006, and Iberia Medical instituted surveillance activities less than one month after the accident without any evidence to suggest Ms. Ward did not sustain a work-related injury. In other words, Iberia Medical seems to have immediately begun a campaign to terminate Ms. Ward's benefits without any basis for such a campaign. We find no merit in this assignment of error.

**DISPOSITION**

For the foregoing reasons, we amend the judgment of the WCJ to reduce the period of time Ms. Ward is entitled to TTD benefits to eighteen months past February 3, 2006. We affirm the judgment in all other respects. We render judgment in favor of Wendy Ward and against Iberia Medical Center in the amount of $5,000.00 as

attorney fees for the prosecution of this appeal.  We assess all costs of this litigation to Iberia Medical Center.

**AFFIRMED AS AMENDED AND RENDERED.**