835 So.2d 724 (2002)
Allen FABRE
v.
ICF KAISER INTERNATIONAL.
No. 2001 CA 2734.
Court of Appeal of Louisiana, First Circuit.
November 8, 2002.
*725 Daniel Becnel, LaPlace, Counsel for Plaintiff/Appellee Allen Fabre.
Philip J. Borne, New Orleans, Counsel for Defendant/Appellant ICF Kaiser International.
Before: KUHN, DOWNING and GAIDRY, JJ.
DOWNING, J.
An employer and its insurer appeal a judgment from a workers' compensation tribunal awarding the reinstatement of benefits for a former employee allowing additional back surgery and psychiatric counseling and awarding attorney fees. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
Allen Fabre filed for workers' compensation benefits against his employer ICF Kaiser International (ICF).[1] Fabre claims *726 he suffered an on the job injury to his back on March 28, 1995, when he fell from a pipe rack while working at the Shell plant in Norco. He alleged that he was injured when jerked to a sudden stop by his safety harness after losing his balance and falling. He first declined medical treatment, assuming that the pain was nothing more than a pulled muscle. Fabre continued working in spite of the pain, but three months later, he finally went to see his family physician, Dr. Montegut, about pains in his groin area. He did not tell the doctor about the accident at that time. A few months later, he returned to Dr. Montegut because the groin pain had spread to his lower back, and at this time he mentioned the fall. Dr. Montegut sent him to an orthopedic surgeon who in turn referred him to physical therapy. When therapy became too painful, he was referred to an orthopedic surgeon.
Eventually, on March 6, 1996, after seeing two neurosurgeons, Dr. Dzung Dinh of the Tulane Medical Center performed an anterior laparoscopic interbody fusion on his back. Dr. Dinh recommended that Fabre consult with a pain management specialist and a psychiatrist.
The pain was better immediately following the surgery, but not so much better that he could return to work. Fabre began to wear a support brace and saw Dr. Edna Doyle for physical therapy. On February 26, 1997, Dr. Doyle noted that Fabre said that a couple of days before Mardi Gras he was standing on an ice chest that wobbled, and he slipped off. Later the pain returned full force and he had to cease the physical therapy. ICF requested he see Dr. John Schuhmacher, another neurosurgeon. On June 2, 1999, Dr. Schuhmacher recommended a package of discography, facet blocks, a psychological pain evaluation, and external bracing. On November 9, 1999, Fabre went back to Tulane and was seen by Dr. Donald Dietz. Dr. Dietz requested a "thin-cut CT scan" and noted that the pain was consistent with pseudoarthrosis at the level of the fusion previously performed. Fabre returned to Dr. Schuhmacher on April 3, 2000 to see if he agreed with Dr. Dietz. Dr. Schuhmacher felt that if Fabre did not have the surgery, he should be able to return to sedentary light occupations and recommended a neuropsychological pain evaluation before surgical intervention.
Due to the conflict of opinion, ICF requested an IME, which was performed on June 22, 2000, by another neurosurgeon, Dr. Anthony Ioppolo. Dr. Ioppolo agreed with Dr. Schuhmacher's opinion on the use of external bracing instead of surgery.
Previously, on May 8-9, 2000, a surveillance tape was filmed of Fabre's activities and the adjuster dispersed them to Fabre's treating physicians, including the IME doctor. On August 11, 2000, Dr. Ioppolo said that after viewing the tape, Fabre appeared to have unrestricted movement, indicative of the fact that he was not having a great deal of pain or activity restriction. Thus, he would not consider Fabre to be a surgical candidate.
Fabre's benefits were terminated. On July 31, 2000, Fabre filed a Disputed Claim for Compensation, alleging that giving the surveillance tape to the IME constituted an unethical contact with his physician.
The matter was heard May 9, 2001, and judgment was signed June 14, 2001. The WCJ ruled in favor of Fabre and against ICF, finding that Fabre (1) was injured on *727 the job, (2) was entitled to have his benefits reinstated, (3) was entitled to have the recommended surgery, (4) was entitled to have the recommended psychiatric treatment, and (5) the termination of his benefits was arbitrary and capricious, entitling him to $3,000 in attorney fees.
ICF appealed alleging that the WCJ erred (1) by finding that Fabre established an on-the-job accident, (2) by failing to find that Fabre willfully misrepresented facts to obtain benefits, and (3) in disregarding Dr. Ioppolo's opinion and finding instead finding that Fabre met the burden to demonstrate the need for additional surgery.

DISCUSSION

On The Job Injury
The WCJ found that Fabre sustained an injury in the course and scope of his employment after hearing his testimony concerning how the accident happened. Fabre testified that he lost his balance and fell from a pipe rack. Although he was hitched to a safety harness, the harness caught on the monitoring gauges, and he was jerked to a stop. Then finding a foothold, he climbed down from the pipe rack. The accident itself was not witnessed, but a Shell employee came by as he was climbing down and helped him to the ground. Fabre testified that he reported the incident to the supervisor and that he later made a written report.
An accident is defined as "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury." LSA-R.S. 23:1021(1). The determination of whether an accident occurred is to be construed from the worker's perspective. Notably, however, the claimant's burden of proof is not relaxed, for he must still establish a work-related accident by a preponderance of the evidence. Haws v. Professional Sewer Rehabilitation, Inc., 98-2846, p. 6 (La.App. 1 Cir. 2/18/00), 763 So.2d 683, 688. A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident, and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. Id.
Thus, in determining whether a worker has shown by a preponderance of the evidence that an injury-causing accident occurred in the course and scope of his employment, the trier of fact is expected to focus on the issue of credibility because, absent contradictory circumstances and evidence, a claimant's testimony is accorded great weight. Id.
In the instant case the WCJ accepted Fabre's version of events and found that his testimony was not contradicted. The WCJ also stated that if Fabre's employer really wanted to oppose the factual occurrence of this accident, a representative from ICF would have appeared and contested it.
The only evidence introduced by the defense to cast doubt on Fabre's version of the accident was his failure to seek medical treatment with Dr. Montegut until three months after the accident, and his continued work. The WCJ specifically found Fabre's reasons for continuing to work credible. He testified that he had previously been laid off and that with four children, he needed his job, so he worked in pain. Fabre testified that at the time of the accident, he did not realize how badly he was injured. The WCJ also found Fabre's explanation as to why he did not immediately go the doctor credible.
*728 WCJ determinations as to whether the claimant's testimony is credible and whether the claimant has discharged his burden of proof are factual determinations that will not be disturbed upon review in the absence of manifest error. Haws, 98-2846 at p. 6, 763 So.2d at 688. Moreover, an employee should not be barred from recovery because he did not realize or diagnose the full extent of his injury immediately after it happened. Id. Finding no manifest error, we will not disturb the WCJ finding that an on the job injury occurred.
This assignment of error is without merit.

Willfully Misrepresenting Facts To Obtain Compensation
ICF alleges that Fabre misrepresented his prior medical history and subsequent accident to his treating physicians and this misrepresentation constitutes fraud under LSA-R.S. 23:1208 which provides:
A. It shall be unlawful for any person for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person to willfully make a false statement or representation.
. . . .
E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.
In asserting that Fabre forfeited his entitlement to benefits under this statute, the appellants refer this court to Fabre's failure to inform his treating physician with accurate medical history. ICF contends that Fabre failed to make any mention of his back injury during the first visit to his doctor and that was three months after the alleged accident. Not until nearly six months after the alleged accident did he complain to the doctor of his back hurting. Fabre also failed to report that previously he had fallen off of an ice chest at a Mardi Gras parade.
With respect to this issue, the WCJ stated in pertinent part that Fabre testified that following the accident he first developed a pain in his groin area, and he was concerned it was cancer, prompting his first visit to the doctor. Dr. Montegut evaluated his groin pain and did not mention any back pain, "so the Court does see where it might raise a question in the adjuster's mind." It was not until the pain spread to his back that he began to relate the two. At that time he went back to Dr. Montegut with back pain. Dr. Montegut ordered x-rays that showed some possible problems at the L5-S1 area of his back and referred him to Dr. Binder. The WCJ said another area that probably gave the adjuster some concern was an item in Dr. Montegut's notes concerning his complaint about low back pain he had been having on and off for five years that increased with lifting, and with still no mention of the accident. The WCJ noted that he also had a prior back sprain in April 1992, but that was years before the accident. The WCJ concluded, "in my mind, this is not enough to question the occurrence of the accident." The adjuster testified that she terminated benefits based on Dr. Montegut's notations. The WCJ said, "it is easy to understand, someone developing pain in an area other than their back and being concerned about it being cancer or something different." It did not surprise the WCJ that there were no notes in Dr. Montegut's records on the back pain when he was there for a cancer scare incident, especially since at the very next visit he returned and was treated for back pain. The WCJ stated that just because Dr. Montegut's records say that he has had low back pain *729 off and on for five years does not mean he specifically withheld information. He testified that he has had back strains off and on before and that he went to a chiropractor three years earlier. The WCJ found that Fabre was not making a deliberate misrepresentation.
ICF also alleged that Fabre's account of how the accident occurred was contradictory. He told some doctors he fell from the pipe rack, and told others that he slipped from the pipe rack and told still others that he was injured while climbing down from the pipe rack. The WCJ found that these statements were not materially inconsistent and that the history he gave the doctors was very consistent with his testimony. The WCJ found "that is not enough to deny [the] claim" pursuant to LSA-R.S. 23:1208. We agree.
Louisiana Revised Statute 23:1208 requires the following elements to establish a false representation justifying forfeiture of benefits: (1) a false statement or representation, (2) made willfully and deliberately, and (3) made for the purpose of obtaining workers' compensation benefits. This broadly worded statute encompasses statements made to anyone and all three requirements must be met before a claimant can be penalized. Short v. Gaylord Chemical Corp., 98-0606, p. 10 (La.App. 1 Cir. 4/1/99), 731 So.2d 493, 499.
Our review of the record supports the WCJ's decision, and we find no manifest error in the WCJ's determination that recovery is not precluded by LSA-R.S. 23:1208. All of the doctors describe how the accident occurred a little bit differently, but in general, they all reported that it occurred on a pipe rack. The WCJ specifically found that the evidence "overwhelmingly supports" Fabre's position that he had a work related injury. Factual findings in a workers' compensation case are subject to the manifest error standard of appellate review. Haws, 98-2846 at p. 5, 763 So.2d at 688. Here we see no manifest error. Thus, the second assignment of error is without merit.

Demonstrating the Need for Additional Surgery
ICF alleges that the WCJ erred in disregarding the opinion of Dr. Ioppolo, the independent medical examiner, and in finding that Fabre sustained his burden of proof that he needed additional surgery on his back.
Pursuant to LSA-R.S. 23:1123, if a dispute arises as to the employee's condition, the WCJ is allowed to order an independent medical examination by an impartial doctor. The statute further provides that the report of the IME doctor shall be "prima facie evidence of the facts therein stated in any subsequent proceedings under this Chapter." LSA-R.S. 23:1123. However, even prima facie evidence may be overcome with other credible evidence. Although the legislature has accorded significant weight to the testimony of a court appointed IME physician, that testimony is not conclusive. The WCJ must still evaluate the witnesses and reach an ultimate decision in the matter. Brasseaux v. Abbeville General Hospital, 97-1062, p. 5 (La.App. 3 Cir. 3/18/98), 710 So.2d 340, 343, writ granted in part, reversed in part, 98-1066 (La.6/5/98), 720 So.2d 673.
The WCJ found that Fabre had one successful disc surgery but he developed pseudoarthrosis.[2] His Tulane Medical Center neurosurgeon, Dr. Donald Dietz,[3] *730 thought it could be corrected with another surgery. The employer chosen neurosurgeon, Dr. John Schuhmacher, gave a second opinion, recommending that he be supplied with facet block injections at the L5-S1 level to determine whether that was the generator for the pain. This was not done. Dr. Dietz asked as early as November 1999 to repeat an MRI to determine if surgery was needed. In December 1999, the bone scan showed pseudoarthrosis at the L5-S1 level. And at this time, based upon the bone scan and Fabre's progressive complaints and continued back, left leg and groin pain, Dr. Dietz began to recommend a type of surgery performed from the front and the back that is more stabilizing than the first surgery that resulted in pseudoarthrosis.
The WCJ explained that on April 3, 2000, Fabre was sent back to Dr. Schuhmacher who noted that he was showing signs of depression because of the constant back pain and again recommended a psychiatric evaluation. Dr. Schuhmacher did not recommend surgery at this time although he did not disagree that Fabre had pseudoarthrosis and that it was painful. Dr. Schuhmacher wanted to try bracing first. He also said that if Fabre did not have the surgery, he could probably return to light duty or sedentary work, but if he did undergo surgery, it would take him about a year to recover. Dr. Ioppolo agreed with Dr. Schuhmacher. The WCJ found that as of July 2000, neither of these doctors stated Fabre should not have the surgery, just that they would try other measures first. The WCJ found that this indicated that surgery was a reasonable and necessary choice and, just because one doctor might try something else before performing surgery, that is not enough to say that they disagree with Dr. Dietz, the treating physician.

Surveillance Video
Surveillance tapes were recorded of Fabre's activities on May 8th, 9th, and June 5, 2000, and sent to all of his treating physicians, including the IME physician prior to his report, without the consent of Fabre's attorney. ICF alleges that it was an error for the WCJ to disregard the IME report even if "tainted" by the tapes.
The WCJ found that the adjuster's action made the IME report of no value because it had been tainted by consideration of the tapes, since an IME is supposed to be unbiased. The WCJ held that a proper way of handling the tapes would have been to bring them to the WCJ's attention and then set up a deposition so that claimant and claimant's attorney could be present while the doctor viewed the video; thereby ensuring the doctor's evaluation was "an even playing field."
We agree with the WCJ who stated that for the adjuster to take it upon herself to send the IME doctor a surveillance video and then ask him to look at the tape to see if it changes his mind "is beyond the parameters of what they are able to do. They are not to have any contact with an independent medical examiner." After Dr. Ioppolo viewed the tapes he sent a letter stating that Fabre had unrestricted movement, and that the tapes demonstrating him bending, lifting and pushing a cart, unloading and loading a car, and walking. He felt that this activity was not indicative of someone having a great deal of pain and, thus, Fabre would not be a surgical candidate. The WCJ ruled that this tainted report would not be considered in her decision. The WCJ found that, in her opinion, there was nothing in the tapes to dispute his injury. The WCJ found that after three days of video, the only significant activity filmed was Fabre pushing a grocery cart, which any three year old can do and loading the bags into the back of *731 the truck one at a time. The WCJ noted that Fabre sat on the tailgate to arrange the groceries instead of stretching across the rear of the truck. He also picked up an empty aquarium, and later leaned over to connect a trailer hitch to his pickup. The WCJ commented that hitch seemed to be a ball type attachment and the video did not show that he had to pull or strain to hitch the trailer.
We find no manifest error in this determination. The weight given to the opinion of the IME can vary in accordance with the various factors that a trial judge utilizes in evaluating the testimony of any other witness. Thus, the weight can be lesser or greater depending on the type of examination the doctor performs and his opportunity to observe the patient and his review of other physicians examinations. Brasseaux, 97-1062 at p. 6, 710 So.2d at 343.
A finding of whether a particular medical treatment is necessary is a factual determination and will not be reversed in the absence of manifest error. Alleman v. Fruit of the Loom-Crowley, 96-1246, pp. 5-6 (La.App. 3 Cir. 3/5/97), 692 So.2d 485, 488. The question on review is not whether the trier of fact was right or wrong but whether the conclusion was reasonable. Freeman v. Poulan/Weed Eater, 93-1530 (La.1/14/94), 630 So.2d 733. Based on the testimony and the records in evidence, we find that the WCJ did not err in finding Fabre to have a second surgery on his back was a reasonable and necessary medical procedure. The evidence showed he responded well after the first surgery and his condition was improving until the development of pseudoarthrosis. The WCJ was not manifestly erroneous in finding that Fabre suffered chronic pain for six years since his work-related accident and was entitled to treatment necessary to relieve the pain he suffers as a result of his disability.
Accordingly, this assignment of error is without merit.

DECREE
For the foregoing reasons, we affirm the decision of the workers' compensation judge.
AFFIRMED.
NOTES
[1] On October 26, 2000, ICF filed an Answer denying that allegation. On April 11, 2000, ICF filed for leave of court to supplement its Answer to dispute among other things, whether Fabre sustained an accident while working for ICF; whether his back injury was due to a work related injury; whether he was capable of working; whether the surgery recommended by Dr. Dietz was necessary; whether Fabre made false statements for the purpose of obtaining workers' compensation; and whether ICF was entitled to restitution. On April 18, 2001 the WCJ denied the motion.
[2] Pseudoarthrosis is defined as the nonhealing of fusion bone.
[3] The successful disc surgery was performed by Dr. Dzung Dinh who replaced Dr. Dietz at the Tulane Medical Center.