JOHNSON, Justice.[1]
|, We granted this writ application to determine whether the court of appeal erred in finding: 1) Claimant, Wendy Ward, submitted sufficient evidence to prove she sustained a work-related injury to her hand; 2) Claimant was entitled to reinstatement of temporary total disability (“TTD”) benefits to eighteen months past February 3, 2006; and 3) the evidence supported a finding that her employer, Iberia Medical Center, was arbitrary and capricious in terminating benefits so as to award Claimant penalties and attorneys’ fees. After considering the record and the applicable law, we affirm in part, and reverse in part.

FACTS AND PROCEDURAL HISTORY

Claimant, Wendy Ward, was hired as a relief food service worker at Iberia Medical Center in December of 2005. On Friday, February 3, 2006, Ms. Ward and her coworker, Joy Erikson, were attempting to move a large food cart into the service elevator at the medical facility. Due to the size of the cart, there was only a couple of inches of clearance between the cart and the sides of the elevator. Ms. Ward |2alleged that she sustained an injury to her left hand while she was moving the food cart into the elevator. Descriptions of the mechanics of how the accident occurred have varied, causing Iberia Medical to eventually dispute that an accident actually took place.
Ms. Ward contemporaneously informed Ms. Erikson of her injury. While Ms. Erikson did not see exactly what happened, she did observe Ms. Ward’s hand immediately afterward and noticed that it was swollen. She advised Ms. Ward to report the accident to her supervisor, Annie Hines. Ms. Ward reported the accident to Ms. Hines, who completed an “Employee Report of Injury/Illness/Incident,” containing the following notation about the accident: “Pushing lunch cart and shut elevator on hand.” Ms. Hines observed an abrasion and swelling on Ms. Ward’s left hand and encouraged Ms. Ward to seek medical treatment in the emergency room. Ms. Ward declined, believing that her hand “would be okay.”
Ms. Ward returned to work on Monday, February 6, 2006. Her hand had not improved over the weekend and was still swollen, so she sought an evaluation in the emergency room at Iberia Medical. The emergency room record shows Ms. Ward’s complaint as “left wrist & hand pain & swelling.” The examining physician concluded that Ms. Ward sustained a contusion to her left hand as a result of her hand being caught between an elevator and a food cart. Ms. Ward was released with instructions to follow up with her personal physician and to take Tylenol for pain.
On February 8, 2006, Ms. Ward saw her personal physician, Dr. Kimberly Smith. At the time of the office visit, Ms. Ward’s hand and wrist were swollen and bruised. According to Dr. Smith’s records, Ms. Ward’s hand was smashed between a cart and the elevator. Dr. Smith gave Ms. Ward an “excuse slip” for work for the period from February 8, 2006, through February 13, 2006. Dr. Smith subsequently | .^provided a second “excuse slip” through February 24, 2006. Ms. Ward saw Dr. Smith again on February 24, 2006, *425 at which time Dr. Smith noted the wrist was sprained and Ms. Ward was advised to keep it wrapped or braced. Ms. Ward continued to have decreased range of motion in her left wrist and pain with movement of the wrist and hand, along with tenderness. Dr. Smith continued Ms. Ward on prescription medications for pain and gave her another “excuse slip” through March 6, 2006.
When Ms. Ward’s condition failed to improve, Dr. Smith referred her to Dr. Andre Cenac, an orthopedic surgeon. Dr. Cenac first examined Ms. Ward on March 15, 2006. In his initial evaluation, he described Ms. Ward’s medical history as follows: “Back on the 3rd she had a deep contusion to the hand. She works at Iberia General and had a contusion to her left hand in the elevator. She was apparently delivering food services.” Dr. Cenac observed swelling of the entire back of her left hand, and noted a limited range of motion. He prescribed physical therapy and pain medication, along with a compression glove. When he saw Ms. Ward again on April 12, 2006, Dr. Cenac noted Ms. Ward was progressing through therapy and recommended continuing the previously prescribed medical management. Because she continued to have no use of her left hand, he released her for light duty working in the Medical Records department, with no use of the left upper extremity.[2] Dr. Cenac examined Ms. Ward again on June 19, 2006. During this visit, Dr. Cenac noted that the physical exam was suggestive of possible RSD[3] and suggest ed that Ms. |4Ward undergo an EMG/ NCT.[4] Ms. Ward did not undergo this testing. Dr. Cenac indicated Ms. Ward’s work status as “unable to return to work at this time.”
At the request of Iberia Medical, Ms. Ward was seen by Dr. E. Scott Yerger, an orthopedic surgeon, for a second medical opinion. Dr. Yerger first examined Ms. Ward on August 2, 2006. His notes describe Ms. Ward’s history as follows: “Ms. Ward is a 40-year old female who states she had her hand caught in an elevator between the door and a food cart that she was pushing on February 3, 2006. She has had pain and night pain in her left hand and wrist since that time. She states she has numbness in the left long finger and she gets swelling with the hand and wrist. She states the hand feels cool to touch and is very hypersensitive to light touch.” During the physical exam, Dr. Yerger noted Ms. Ward lacked terminal flexion of the PIP and DIP joints[5] of the fingers in regards to making a fist, and she had pain upon making a fist. He also noted decreased light touch in the tip of the long finger. Objectively, Dr. Yerger *426 noted decreased skin turgor[6] on the left wrist and hand, and the skin of the left hand was “duskier” in appearance and paler than the right hand. He further noted that Ms. Ward had pain and tenderness with very light touch over the left hand, as well as with range of motion of the joints of the fingers and the wrist. It was Dr. Yerger’s opinion that Ms. Ward suffered a contusion when her hand got caught between the elevator door and the cart. He opined that she had developed a complex regional pain syndrome. He further opined that she had not reached maximum | ^medical improvement (“MMI”), and recommended she be evaluated by a pain management specialist for formal hand/occupational therapy and other treatment for complex regional pain syndrome.
Iberia Medical hired an investigator to conduct surveillance on Ms. Ward.[7] Surveillance was conducted from July 13, 2006, through August 8, 2006, and the surveillance video was compiled into a ten-minute segment on disc. On August 9, 2006, Iberia Medical provided Dr. Yerger with the surveillance video of Ms. Ward. Dr. Yerger was asked to review the video and “comment on Ms. Ward’s ability to work in light of what is contained on the video.” Specifically, Iberia Medical requested Dr. Yerger’s thoughts on whether Ms. Ward could return to work in her prior position as a food service worker.
On August 25, 2006, Dr. Yerger issued an addendum to his August 2, 2006 report. In the addendum, Dr. Yerger noted the activities on the surveillance video on July 13, 2006, as follows: “she appears to be carrying a newspaper out of what appears to be a grocery store in her left hand. She drinks using her left hand and she repeatedly grooms herself throughout the video using her left hand. She is not wearing any compression glove, she appears to have no difficulty moving her left hand, and appears to have full range of motion.” Relative to the portion of the video dated July 24, 2006, Dr. Yerger noted: “In this video she is seen opening the door of a building with her left hand. She pushes this door open, closes this door and appears to have full motion in that left hand and wrist. She also grooms herself with her left hand.” Based on his viewing of the video, Dr. Yerger concluded that “[Ms. Ward] appears to have no difficulty using her left upper extremity, including the left hand | r,and wrist. In my history taken with her, dated 8/2/06, she states that she has pain with flexion and extension of the fingers and wrist, but during the review of these videos she appeared to have no difficulty using the left hand and wrist for these various activities of daily living.” Dr. Yerger opined:
I do believe she suffered a contusion to the left hand and wrist when she had her left hand caught in the door of an elevator, between the elevator and the food cart that she was pushing in a hospital, but it would be difficult for her to have a Complex Regional Pain Syndrome of her left upper extremity involving the left hand and wrist and still be able to perform the activities that she was doing on these videos. In light of these surveillance videos, I think she’s able to return to work at her prior position as a food service worker and that *427 she had likely reached maximum medical improvement.
Dr. Yerger testified by deposition that the activities he viewed on the videos did not “go along with” complex regional pain syndrome. Dr. Yerger did admit that all of the objective findings during the physical exam are objective symptoms of complex regional pain syndrome, and agreed he would instruct a patient who was developing a complex regional pain syndrome to try to use her hand as much as possible; however, he explained that with complex regional pain syndrome, any type of movement or light touch is a cause of pain. There are no good days and bad days, or days when you can and cannot use your hand in routine activities of daily living. In his opinion, Ms. Ward appeared to use her left upper extremity without any difficulty, and there did not appear to be any pain or guarding of her left hand. Further, the second video was taken a week before his examination on August 2, 2006, wherein Ms. Ward appeared very symptomatic. He opined that if Ms. Ward had complex regional pain syndrome, she would have had these same types of symptoms a few weeks prior. Dr. Yerger believed Ms. Ward may have misled him during her physical exam. Based on the surveillance, Dr. Yerger changed his opinion and changed his recommendations regarding treatment and Ms. Ward’s ability to 17work.
On August 16, 2006, Iberia Medical sent a copy of the surveillance video to Dr. Cenac asking him to review and then “comment in writing if you feel that Ms. Ward could return to her prior position in the food service [department] at the hospital? Could she do any kind of employment in your opinion? If she has restrictions, what would they be?” On September 6, 2006, Iberia Medical again wrote to Dr. Cenac asking him to review the video “in light of her ability to return to her former employment or any sort of restricted employment.” Iberia Medical did not receive a response to these two letters from Dr. Cenac.
Based on Dr. Yerger’s opinion that Ms. Ward had reached MMI and could return to work, Iberia Medical terminated her indemnity benefits as of September 5, 2006.[8] Ms. Ward never returned to her position at Iberia Medical. On September 18, 2006, Iberia Medical filed a disputed claim for compensation with the Office of Workers’ Compensation (“OWC”), alleging not only that Ms. Ward was capable of returning to regular work duties, but that she had forfeited her right to receive workers’ compensation benefits based on her fraudulent actions in providing misleading information pertaining to her injury and medical condition. On October 10, 2006, Ms. Ward filed a separate disputed claim based on Iberia Medical’s failure to pay indemnity benefits, to authorize medical treatment, to correctly calculate her workers’ compensation rate, and for the premature termination of her indemnity benefits.
On December 12, 2006, Iberia Medical again wrote to Dr. Cenac asking for Ms. Ward’s current medical status and also provided Dr. Cenac with a copy of Dr. Yerger’s August 25, 2006 addendum. On December 14, 2006, Dr. Cenac advised that | Rhe reviewed the surveillance video, along with Dr. Yerger’s addendum, and agreed that Ms. Ward had reached MMI and could return to regular duty work.
Dr. Cenac last saw Ms. Ward on April 18, 2007, at which time he ordered a triple-phase bone scan, the standard test for *428 RSD, and an FCE (“functional capacity exam”) to diagnose Ms. Ward’s ongoing problems. He ordered these tests to make sure she did not “go away” without a proper diagnosis. His notes do not reflect any objective findings, and he testified “if at that time I made no special notes about swelling or discoloration, then it probably was not there.” Dr. Cenac also explained that with RSD, the average time of involvement to the extremity is eighteen months. At the time he was deposed, it was twenty months post accident, past the usual time of involvement, thus even if Ms. Ward had the triple-phase bone scan at that point, he did not know what it would show.
Dr. Cenac acknowledged that his opinion changed between June and December of 2006 because of the surveillance video he received from Iberia Medical. He explained that in the surveillance video taken in July of 2006, Ms. Ward appeared to be using her hand relatively normally and she was not wearing the compression glove. Dr. Cenac testified that despite changing his mind concerning diagnosis and Ms. Ward’s ability to return to work, he was still of the opinion that Ms. Ward had sustained a contusion to her left hand based on the objective signs of swelling of the hand and wrist. He was also impressed with the fact that Dr. Smith had seen such significant swelling as to refer Ms. Ward to him for evaluation, giving credibility to the existence of a significant traumatic event causing an injury.
The claims of Iberia Medical and Ms. Ward were consolidated and came to trial on October 15, 2008. In addition to the testimony cited above, Ms. Ward and her friend, Danette Guillotte, testified regarding Ms. Ward’s medical condition. Ms. | sWard described the continuing problems with her hand, as documented in the records of Drs. Cenac and Yerger. She explained that she did not have the EMG and nerve conduction study recommended by Dr. Cenac because neither Dr. Cenac’s office nor Dr. Lacie Alfonso, who was to perform the testing, contacted her to schedule the tests. However, Dr. Cenac testified that his records showed Ms. Ward was scheduled for the EMG and nerve conduction tests with Dr. Alfonzo, but Ms. Ward did not show up for that appointment. Ms. Ward further testified she did not have the triple phase bone scan recommended by Dr. Cenac because it was not approved for payment by Iberia Medical or the insurer. At the time of trial, Ms. Ward testified her left hand still bothered her often, especially in hot or cold conditions. She stated that she did not wear the compression stocking glove all the time because it caused her hand to hurt more. To explain the surveillance tapes, Ms. Ward testified that she followed the instructions of Dr. Cenac and the therapist who told her to use her hand as much as possible. She admitted to missing some physical therapy appointments, but explained this was due to lack of transportation. She further testified she could not perform her prior job at Iberia Medical because she cannot carry the food trays.
Sheila Jacquette, a childhood friend of Ms. Ward, also testified. Ms. Jacquette testified that between childhood and late 2007, she had no contact with Ms. Ward, but they became reacquainted after Ms. Ward moved into the same neighborhood following Hurricane Katrina. Since their reacquaintance, Ms. Jacquette had heard Ms. Ward complain about not being able to carry heavy items with her left hand and that her hand was susceptible to hot and cold temperatures. She also saw Ms. Ward’s left hand swell on one occasion when Ms. Ward was sitting in a car. Ms. Jacquette testified she had also seen Ms. Ward shake her hand and complain of stiffness or discomfort in her fingers, and *429 she observed Ms. Ward wearing a compression glove | inon several occasions.
Testimony at trial also focused on the factual dispute regarding the accident. Although it was first reported that Ms. Ward was pushing the cart into the elevator, Ms. Ward testified in her deposition that she was pulling the food cart back into the elevator. At trial, Ms. Ward testified that she was pushing the cart into the elevator. However her coworker, Ms. Er-ikson, testified Ms. Ward was pulling the cart into the elevator. Because the single elevator door closes from left to right, counsel for Iberia Medical demonstrated that a version of the accident wherein Ms. Ward was pulling the cart into the elevator (i.e. backing into the elevator) could not possibly have caused her left hand to be caught in or hit by the elevator door.
Following a trial on the merits, the OWC hearing officer rendered a judgment finding that Ms. Ward suffered a work-related accident, awarded her TTD benefits for February 6-10, 2006 (the one-week waiting period), reinstated her TTD benefits as of September 6, 2006, and awarded her $8,000.00 in penalties and $14,667.65 in attorneys’ fees based on Iberia Medical’s arbitrary and capricious termination of indemnity benefits. The hearing officer found that Ms. Ward successfully proved she had an accident in the course and scope of her employment. Noting that Ms. Ward is not required to show the exact manner in which her hand was “caught” in the elevator, the hearing officer concluded that “somehow, someway, the small door and the large cart somehow caused her left hand to get smashed.”
In finding Iberia Medical arbitrarily and capriciously terminated Ms. Ward’s benefits, the hearing officer noted that the video surveillance only showed Ms. Ward performing insignificant activities.[9] He concluded that the “purely unilateral use of 11 [Video surveillance video, especially one as disjointed, ill-conceived and poorly produced as the one in open court to justify termination of medical treatment and indemnity payments to an injured worker flies squarely in the face of any sense of fair play.”
Iberia Medical appealed the judgment, and the court of appeal amended and affirmed.[10] The court of appeal found that Ms. Ward met her burden of proving a work-related accident. The court found no manifest error in the OWC hearing officer’s factual finding that, regardless of whether Ms. Ward was pushing or pulling the food cart, or whether she was struck by the closing elevator door or the side of the elevator itself, she sustained a work-related injury. The court noted there was no evidence of a pre-existing injury; her coworker, Ms. Erickson, had not observed any disability or evidence of traumatic injury prior to Ms. Ward’s complaint, but observed that Ms. Ward’s hand and wrist had immediately begun to swell after this event; Ms. Ward immediately reported the accident to her supervisor, Ms. Hines, who also testified that she observed an abrasion on, and swelling of, Ms. Ward’s hand; and, both Drs. Cenac and Yerger testified that Ms. Ward had sustained a traumatic injury to her hand. The court acknowledged inconsistencies in Ms. Ward’s testimony, but found those to have *430 no relevance as to whether she proved a work-related accident.
Regarding the use of the surveillance video, the court of appeal noted that despite maintaining surveillance of Ms. Ward for a period of almost six months beginning in March of 2006, the most Iberia Medical could produce was an approximate ten-minute segment taken on July 13, 2006, and July 24, 2006, revealing Ms. Ward performing minimal activities and not wearing her compression glove. The court further noted that while the surveillance video was obviously impressive to Drs. |12Yerger and Cenac, the OWC hearing officer found the video to be less than convincing. The court found no error in the hearing officer’s conclusion in this regard, citing Fabre v. ICF Kaiser Int’l, 01-2734 (La.App. 1 Cir. 11/8/02), 835 So.2d 724.
Regarding the reinstatement of TTD benefits, the court of appeal amended the judgment to reduce the period of time Ms. Ward was entitled to TTD benefits to eighteen months past February 3, 2006, noting this period of time accorded with Dr. Ce-nac’s testimony that RSD only lasts an average of eighteen months. The court reasoned reinstatement of TTD benefits was supported by the testimony of Ms. Ward and Ms. Jacquette. The court further referred to the testimony of Drs. Ce-nac and Yerger, noting their determination that Ms. Ward had reached MMI and was capable of returning to work was based on the surveillance video and not on an actual physical examination of her hand.
The court of appeal also found no error regarding the award of penalties and attorneys’ fees, noting that the medical opinions relied on to terminate Ms. Ward’s benefits were based on Iberia Medical’s surveillance video and not a medical evaluation. Additionally, in considering Iberia Medical’s attitude toward Ms. Ward’s claim from the beginning, the court noted she was never paid disability benefits for the week of February 6-10, 2006, and Iberia Medical instituted surveillance activities less than one month after the accident without any evidence to suggest Ms. Ward did not sustain a work-related injury. The court found that Iberia Medical seemed to have immediately begun a campaign to terminate Ms. Ward’s benefits without any basis for such a campaign.
Iberia Medical filed a writ application with this Court, which we granted.[11]
| ^DISCUSSION
Iberia Medical raises three assignments of error: 1) the lower courts erred by determining that Ms. Ward sustained a work-related injury; 2) the lower courts erred by determining that Ms. Ward was entitled to the reinstatement of TTD benefits after September 5, 2006; and 3) the lower courts erred in ruling that Iberia Medical acted in an arbitrary and capricious fashion and improperly terminated Ms. Ward’s benefits.

Work-Related, Injury

An employee is entitled to compensation benefits if she suffers a personal injury by an accident arising out of and in the course of employment. La. R.S. 23:1031; Buxton v. Iowa Police Department, 2009-0520, p. 11 (La.10/20/09), 23 So.3d 275, 283. Accident is defined as “an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.” La. R.S. 23:1021(1). The work-related accident re *431 quirement has consistently been interpreted liberally by our courts. Bruno v. Herbert International Inc., 593 So.2d 357, 360 (La.1992); Williams v. Regional Transit Authority, 546 So.2d 150, 156 (La.1989).
The claimant is still required to prove a work-related accident by a preponderance of the evidence. Buxton, 09-0520 at p. 12, 23 So.3d at 283; Bruno, 593 So.2d at 361; Prim v. City of Shreveport, 297 So.2d 421 (La.1974). A claimant’s testimony alone may be sufficient to meet this burden of proof, as long as no other evidence discredits or casts serious doubt on the claimant’s version of the incident; and the claimant’s testimony is corroborated by the circumstances following the alleged incident. Bruno, 593 So.2d at 361. Corroboration can be provided by the | ^testimony of fellow workers, spouses or friends, as well as by medical evidence. Id. The claimant is not required to establish the exact cause of the disability, but the claimant must demonstrate by a preponderance of proof that the accident had a causal connection with the disability. Quinones v. USF & G, 93-1648 (La.1/14/94), 630 So.2d 1303, 1307.
Whether the claimant has carried her burden of proof and whether testimony is credible are questions of fact to be determined by the OWC hearing officer. Buxton, 09-0520 at p. 18, 23 So.3d at 287. Under the manifest error rule, the reviewing court does not decide whether the fact-finder was right or wrong, but only whether the findings are reasonable. Where documents or evidence so contradict a witness’ story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’ story, the reviewing court may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Ryan v. Zurich American Ins. Co., 2007-2312, p. 12 (La.7/1/08), 988 So.2d 214, 222. But, where such factors are not present, and a finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id.
Iberia Medical argues the lower courts erred in determining Ms. Ward sustained a work-related injury because of her inconsistent testimony and lack of credibility, and because the physical evidence established that her version of the accident was an impossibility. Iberia Medical argues that Ms. Ward’s testimony regarding the mechanics of the incident (whether she was pushing versus pulling the cart into the elevator) was completely unreliable, and her testimony taken as a whole shows that there is a significant question with respect to honesty and reliability.
|15Ms. Ward argues that she is not required to prove the exact cause of the accident, and she is entitled to a presumption of causation between the accident and her disability because if an otherwise healthy worker suffers an accident at work and is thereafter disabled, it is presumed that there is a causal connection between the two, as long as the medical evidence establishes a reasonable possibility of such a connection. Ms. Ward argues it does not matter whether the elevator door closed on her left hand as she pushed the cart into the elevator or whether she smashed her left hand between the sides of the elevator as she pulled the cart into the elevator. Both Ms. Erikson and Ms. Hines independently corroborated the facts of the accident.
Iberia Medical makes much of the inconsistencies regarding the mechanics of the accident. While Ms. Ward’s descriptions of the exact details of the accident have varied, we find these inconsistencies are not sufficient to reverse the lower *432 courts’ factual findings on this issue. Ms. Ward’s core assertion — that her left hand was injured while moving the cart into the elevator — is supported by the evidence and testimony in the record. Ms. Ward’s statements regarding how the accident occurred were not materially inconsistent, and the history she gave her physicians was consistent with her injury. We also find it probative that Ms. Ward told Ms. Erikson about the accident contemporaneously; reported the accident immediately to her supervisor, Ms. Hines; the medical records confirm objective medical findings which support a finding that her hand was injured in the elevator door; and there is nothing in the record evidencing a prior hand injury or any other explanation for her hand injury. We find it irrelevant whether Ms. Ward’s hand was hit by the elevator door as she was pushing the cart into the elevator or whether her hand was caught between the cart and the side of the elevator as she pulled the cart into the elevator. Either way, we find that by reason of her employment with Iberia Medical and an accident h (¡connected therewith, Ms. Ward was injured. The arguments of Iberia Medical primarily relate to credibility questions presented to the OWC hearing officer. Based on our review of the record, we cannot say that the lower courts were clearly wrong in rejecting the attack on Ms. Ward’s credibility. Regardless of the exact mechanics of the accident, we find the OWC hearing officer was not clearly wrong in determining Ms. Ward proved by a preponderance of the evidence that a work-related accident and injury occurred, and thus affirm this finding by the court of appeal.

Entitlement to TTD Benefits after September 5, 2006

A workers’ compensation claimant seeking temporary or permanent total disability benefits bears the burden of proving, by clear and convincing evidence, her inability to engage in any type of employment. Buxton, 09-0520 at p. 21, 23 So.3d at 288. The clear and convincing standard requires a party to prove the existence of a contested fact is highly probable, or much more probable than its non-existence. Talbot v. Talbot, 2003-0814, p. 9-10 (La.12/12/03), 864 So.2d 590, 598.
Iberia Medical argues that it was manifestly erroneous for the lower courts to order the reinstatement of Ms. Ward’s benefits retroactively to September 6, 2006, and extend the disability to eighteen months after the date of the alleged accident. Iberia Medical asserts that Ms. Ward’s testimony that she is no longer able to return to her pre-injury employment, without more, is insufficient to prove entitlement to workers’ compensation benefits. Iberia Medical points out that both Drs. Cenac and Yerger provided testimony and issued reports that Ms. Ward was capable of returning to her pre-injury employment position prior to September 6, 2006, the date that her indemnity benefits were discontinued. And, no medical testimony indicates Ms. Ward was incapable of returning to work after that time.
Ms. Ward relies on Fabre v. ICF Kaiser International, supra, arguing it was 117improper for the defendant to send the surveillance video to the doctors, and the surveillance video tainted the doctors’ opinions, making them unreliable.
The evidence in the record supports Iberia Medical’s position. All of the medical evidence establishes that Ms. Ward was capable to returning to her pre-injury employment at the time the surveillance videos were taken. Dr. Yerger, as well as Ms. Ward’s own treating physician, Dr. Cenac, opined that Ms. Ward could return to work. Ms. Ward did not submit any medical evidence to counter these opinions. *433 The only evidence in the record supporting Ms. Ward’s claim that she could not return to work is her own testimony. Given the contrary medical evidence, we find Ms. Ward did not meet the “clear and convincing” burden of proof.
Additionally, we find that the lower courts erred in holding that the surveillance video compromised the doctors’ opinions such that the courts should ignore those opinions. In disapproving of the manner in which Iberia Medical handled the surveillance video, the court of appeal cited Fabre. However, Fabre is distinguishable from the instant case. In Fabre, the issue involved the hearing officer’s refusal to consider an independent medical examination (“IME”) report because the employer had sent a surveillance video to the IME physician prior to the issuance of his report. Fabre, 2001-2734 at p. 10, 835 So.2d at 730. The Fabre court agreed it was improper for the adjuster to send the surveillance video to the IME doctor to ascertain if it changed his opinion because the defendant should not have any contact with an independent medical examiner. Id. In this case, the surveillance video was not sent to an IME physician, but rather to the physician chosen by Iberia Medical for a second medical opinion and to Ms. Ward’s treating physician.
We agree that parties in workers’ compensation cases should not have | ^unilateral contact with an IME physician. The purpose, as pointed out in Fa-bre, is that an IME “is supposed to be unbiased.” Id. However, we find no prohibition in statute or jurisprudence to prevent an employer from showing surveillance video to the claimant’s treating physician or to the physician who provided a second medical opinion for the employer. Admittedly, the minimal surveillance video produced by Iberia Medical does not show extreme or strenuous activities that would typically be meaningful to a lay person. However, the activities shown on the video were obviously remarkable to both orthopedic surgeons. The lower courts focused on the fact that the doctors changed their opinions based solely on viewing the surveillance video, rather than on a physical exam of Ms. Ward. However, neither doctor expressed a desire or need to reexamine Ms. Ward prior to revising his opinion. In fact, Dr. Cenac examined Ms. Ward again in April of 1997. While he did request additional testing, his opinion that Ms. Ward was able to return to work did not change. With no disputed medical evidence in the record, we must reverse the ruling of the court of appeal finding that Ms. Ward proved her entitlement to TTD benefits after September 5, 2006.

Penalties and Attorneys’ Fees

Because this case involves a discontinuance, rather than nonpayment of benefits, the • standard by which the employer or insurer’s conduct is judged is found in La. R.S. 23:1201(1), which provides, in pertinent part:
Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not to exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims. The provisions as set forth in R.S. 23:1141 limiting the amount of attorney fees shall not apply to cases where the employer or insurer is found liable for attorney fees under this Section.
Awards of penalties and attorneys’ fees in workers’ compensation cases are essentially lioPenal in nature, being imposed to *434 discourage indifference and undesirable conduct by employers and insurers. Williams v. Rush Masonry, Inc., 1998-2271 (La.6/29/99), 737 So.2d 41, 46. Although the Worker’s Compensation Act is to be liberally construed in regard to benefits, penal statutes are to be strictly construed. Id. “Arbitrary and capricious behavior consists of willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation.” Brown v. Texas-LA Cartage, Inc., 1998-1063, p. 8-9 (La.12/1/98), 721 So.2d 885, 890.[12]
Iberia Medical argues the lower courts erred in finding it to be arbitrary and capricious in terminating Ms. Ward’s benefits, where the doctors provided opinions that Ms. Ward had misrepresented her physical and medical condition and was capable of returning to work. Iberia Medical asserts that Ms. Ward’s benefits were terminated after receiving the August 25, 2006, report from Dr. Yerger indicating that Ms. Ward was capable of returning to work. Moreover, this opinion was echoed by Dr. Cenac, Ms. Ward’s treating physician. Iberia Medical notes that no medical evidence was presented to show Ms. Ward was unable to return to work. Iberia Medical argues that it cannot be held liable for penalties and attorneys’ fees if the claim is reasonably controverted and it is entitled to rely upon the opinion of Ms. Ward’s treating physician, Dr. Cenac, in discontinuing benefits.
Ms. Ward argues that Iberia Medical’s providing Drs. Yerger and Cenac with the surveillance video was unconscionable and does not excuse Iberia Medical for being arbitrary and capricious in the termination of benefits. Ms. Ward cites several circuit court cases wherein courts did not allow the employer to rely on surveillance [ 2nvideo to terminate benefits and/or to prove that the employee was guilty of fraud.
We find the record does not support the lower courts’ findings that Iberia Medical was arbitrary and capricious in discontinuing Ms. Ward’s benefits. Contrary to the cases cited by Ms. Ward, Iberia Medical did not rely on the surveillance video alone to discontinue benefits. Iberia Medical did not discontinue benefits after receiving the surveillance video and investigative reports. It was not until after Dr. Yerger issued his supplemental report on August 25, 2006, in which he stated Ms. Ward had reached MMI and could return to regular duty work, that Iberia Medical discontinued benefits. Once Dr. Yerger issued his supplemental opinion, it created a legitimate conflict in the medical evidence, and we cannot say that Iberia Medical’s action terminating Ms. Wards benefits was “without consideration and regard for facts and circumstance presented.” Moreover, Dr. Yerger’s opinion was later confirmed by Ms. Ward’s own treating physician, Dr. Cenac. Iberia Medical was entitled to rely on these medical opinions. Ms. Ward did not provide contrary medical evidence, nor did she demonstrate that either Drs. Yer-ger or Cenac changed their opinions. Given the undisputed medical evidence that Ms. Ward had reached MMI and could return to work, we cannot say that the termination of benefits was arbitrary and capricious. Therefore, we reverse the awards of penalties and attorneys’ fees.

CONCLUSION

Conflicting evidence was presented on the issue of whether a work-related acci *435 dent occurred. The OWC hearing officer resolved this conflict in claimant’s favor, and the court of appeal affirmed that decision. Based on our review of the record, we cannot say the lower courts were clearly wrong in finding that Ms. Ward proved by a preponderance of the evidence that she sustained a work-related accident and injury. Thus, we affirm the court of appeal’s ruling on that issue.
121 However, the record does not support the lower courts’ rulings that the claimant was entitled to reinstatement of TTD benefits, or that Iberia Medical was arbitrary and capricious in terminating Ms. Ward’s benefits as of September 5, 2006. The medical evidence in the record is undisputed that Ms. Ward had reached MMI and could return to work as of September 5, 2006. Thus, we reverse the court of appeal’s rulings on these issues.

DECREE

AFFIRMED IN PART; REVERSED IN PART.
Knoll, J., concurs in part and dissents in part for reasons assigned.

. Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.

. It appears undisputed that a light duty job in medical records was not made available to Ms. Ward.

. Reflex Sympathetic Dystrophy (also known as Complex Regional Pain Syndrome) is chronic neuropathic pain that follows soft tissue or bone injury or nerve injury and persists out of proportion in intensity and duration to the original tissue damage. The Merck Manual 1780 (18th ed.2006).

. EMG, or electromyography, is the recording of electrical activity in a muscle using electrodes placed in the fibers. The procedure is used to diagnose muscle and nerve disorders and to assess recovery in certain types of paralysis. Black’s Medical Dictionary (41st ed.2006).

. PIP joints, proximal interphalangeal joints, are the synovial joints between the proximal and middle phalanges of the fingers and of the toes. DIP joints, distal interphalangeal joints, are the synovial joints between the middle and distal phalanges of the fingers and of the toes. Stedman's Medical Dictionary (28th ed.2006).

. Turgor is defined as being or becoming swollen or engorged. Black's Medical Dictionary (41st ed.2006).

. Iberia Medical submitted an Investigation Request to Consolidated Inspections Agency, Inc. on February 27, 2006. According to reports provided by Consolidated Inspections Agency, surveillance was initially conducted on March 2, 2006, March 6, 2006, and March 20, 2006. However, it was determined that Ms. Ward was out of town during this time, and thus not at her New Iberia residence.

. It was stipulated at trial that Iberia Medical paid indemnity benefits to Ms. Ward, except for the one-week waiting period (February 6-10, 2006), until September 5, 2006.

. The OWC hearing officer stated: “Now, I suppose that if any of these flashes in time had shown Mrs. Ward throwing a shot put, operating a jackhammer or something to that effect, it might be a different matter. But instead, we see Mrs. Ward’s left hand carrying a newspaper, holding a coffee cup and lifting — not sweeping, just lifting — a broom. That’s about it.”

. Iberia Medical Center v. Ward, 2009-0380 (La.App. 3 Cir. 11/10/09), 26 So.3d 784.

. Iberia Medical Center v. Ward, 2009-2705 (La.4/23/10), 32 So.3d 809.

. In Brown, this Court discussed language then found at La. R.S. 23:1201.2. This section was repealed by 2003 La. Acts No. 1204, sec. 2, and its substance is now found at La. R.S. 23:1201(1).