DREW, J.
|,In this workers’ compensation proceeding, Highlines Construction Company (“Highlines”) appeals a judgment ordering it to pay $34,314.42 together with interest to claimant John Smith for prescription drugs that he obtained from Injured Workers Pharmacy (“IWP”), as well as a penalty of $2,000 and attorney fees of $5,000. Smith has answered the appeal, seeking reversal of that part of the judgment denying his claim of entitlement to permanent total disability (“PTD”) . benefits.
We affirm the denial of Smith’s claim of entitlement to PTD benefits, and we also affirm the award of the penalty and attorney fees. We revérse the judgment insofar as it ordered Highlines to pay' for prescription drugs provided by IWP.
FACTS
On August 7, 2003, John Smith was injured while moving steel panels at work for Highlines. Smith felt immediate neck and left upper extremity pain.
Smith received workers’ compensation indemnity payments for 520 weeks. He also received medical benefits, including prescription drug coverage. Gray Insurance Company (“Gray”), the workers’ compensation insurer .of Highlines, provided Smith with a TMESYS .pharmacy card *212 that Smith was to use to have his prescriptions filled at participating pharmacies.
In May of 2013, Smith encountered difficulty in filling his prescriptions using the TMESYS card at a Walgreens pharmacy. Smith’s wife, Faye, alleged that she was told by Walgreens employees that she would have to pay for his drugs because his case had been closed. Faye, |2who usually handled getting the prescriptions filled, then contacted Smith’s attorney, C. Daniel Street, who directed her to IWP.
When IWP sought pre-authorization in May of 2013, Gray declined coverage and informed IWP that it would not pay its invoices and that Smith would have to obtain his drugs through Gray’s “process.” IWP continued to fill Smith’s prescriptions despite receiving repeated notices from Gray that it would not pay for the drugs provided by IWP.
Smith filed this disputed claim for compensation against Highlines and Gray on July 15, 2013, contesting Gray’s refusal to pay for his prescriptions filled by IWP. Smith sought attorney fees, penalties, and the amount owed at the time to IWP,
On September 5, 2013, Gray gave notice of termination of benefits because Smith had received 520 weeks of indemnity benefits. Smith disagreed with the termination, arguing that he was totally and permanently disabled and entitled to medical and indemnity benefits. Smith amended his claim on September 25, 2013, to allege entitlement to permanent total disability benefits of $394.71 per week from August 9, 2013, along with penalties and attorney fees-.
Following a trial, the WCJ ordered Highlines and Gray to pay $34,314.42 and interest to Smith for the IWP bill. High-lines and Gray were also ordered to pay a penalty of $2,000, and attorney fees of $5,000. Smith’s claim for permanent total disability benefits was rejected. Each party was ordered to bear its own costs.
| «DISCUSSION

Permanent total disability

Smith contends that he is entitled to designation as being permanently totally disabled. La. R.S. 23:1221(2), which governs claims for PTD, states, in part:
(a) For any injury producing permanent total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, and experience, sixty-six and two-thirds percent of wages during the period of such disability.
(b) For purposes of Subparagraph (2)(a) of this Paragraph, compensation for permanent total disability shall not be awarded if the employee is engaged in any employment or self-employment regardless of the nature or character of the employment or self-employment including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain.
(c) For purposes of Subparagraph (2)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subpar-agraph (2)(b) of this Paragraph, compensation for permanent total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage, in any employment or self-employment, regardless of the nature or character of the employment or *213 self-employment, including, but not limited to, any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
A claimant seeking PTD benefits bears the burden of proving, by clear and convincing evidence, his inability to engage in any type of employment. Harris v. City of Bastrop, 49,534 (La.App.2d Cir.1/14/15), 161 So.3d 948; State, DOTD v. Berry, 49,186 (La.App.2d Cir.8/13/14), 147 So.3d 270. The clear and convincing standard in a workers’ compensation' case is an intermediate standard falling somewhere between the ordinary preponderance of the evidence civil standard and the beyond a reasonable doubt criminal standard. To prove a matter by clear and convincing evidence means to demonstrate that the existence of the disputed fact is highly probable, or much more probable than its nonexistence. Hollingsworth v. Steven Garr Logging, 47,884 (La.App.2d Cir.2/27/13), 110 So.3d 1219; Young v. Physicians & Surgeons Hosp., 39,348 (La.App.2d Cir.3/2/05), 895 So.2d 723.
Following the 1983 améndments to.the workers’ compensation statute, evidence that an employee could not return to any gainful employment without suffering substantial pain is no longer sufficient to support an award of permanent total disability benefits. Morgan v. Glazers Wholesale Drug Co., 46,692 (La.App.2d Cir.11/2/11), 79 So.3d 417; Bank of Winnfield & Trust Co. v. Collins, 31,473 (La.App.2d Cir.2/24/99), 736 So.2d 263.
A left shoulder MRI taken a few days after the accident showed injury-to that area. The next month, Dr. Douglas Liles performed surgery to repair Smith’s torn left rotator cuff.
Dr. Bernie McHugh, a neurosurgeon, examined Smith on January 4, 2005, on a workers’ ■ compensation consultation. Smith complained of increasing cervical pain- along with left upper extremity pain and radicular symptoms. He told Dr. McHugh that' he was now retired from doing construction- work. Dr. McHugh noted that a cervical MRI from October of 2004 showed severe spondylosis from C4 to C7. Dr. McHugh | ^recommended that Smith receive epidural steroid injections, and if. Smith saw no relief from that, then they would discuss surgical decompression. Dr. McHugh referred Smith to Dr. John Ledbetter, who specialized in pain management. Dr. McHugh believed that he did not examine Smith again until April of 2014, a period of nine years.
Smith first saw Dr. Ledbetter on March 16, 2005, telling him that he had retired on workers’ compensation. His chief complaints were neck pain and left arm numbness. Smith reported an intermittent pain that was worse when he was moving or twisting his neck. Dr. Ledbetter noted unintentional tremors in Smith’s left upper extremity. Dr. Ledbetter’s impressions were: (1) eervicalgia with right upper extremity radiculopathy with MRI[1] evidence of moderate to severe intervertebral disc disease at C4-7 with central stenosis and moderate foraminal stenosis, greater on the left; (2) cervical spondylosis with symptoms suggestive of facet arthropathy *214 as well; ■ (3). secondary myofascial pain; and (4) deconditioning.
Dr. Ledbetter ordered three cervical epidural steroid injections and physical therapy[2] during that first visit. Over the course of the next nine years, Dr. Ledbet-ter’s office regularly examined Smith and performed various medical procedures to help treat his pain. These procedures, which | (¡sometimes granted temporary relief, included cervical epidural steroid injections on six. dates, facet joint injections once, radiofrequency medial branch neuro-tomies on four dates, trigger point injections on nine dates, and medial branch nerve blocks twice.
Dr. Ledbetter noted in February of 2007 that Smith could be released to sedentary work. Two months later, a vocational assessment was performed, during which Smith tested as reading at the 5th grade level, spelling at the 3rd grade level, and doing arithmetic at the 1st grade level. 'A job search was focused in the Monroe area on security guard .and courier positions. Security guard positions were found that fell, within Smith’s, physical restrictions, but the positions were eliminated because of Smith’s education level and his limited ability to read and write.
On January 18, 2010, Dr. Ledbetter had a rehabilitation conference with Smith’s case manager when he considered several positions for Smith. One position was as a sales representative at Sears that Dr. Led-better approved if Smith would be able to sit and rest as needed. A second position was as- a service support representative at Sears. Dr. Ledbetter approved it and added that Smith could probably physically do it, but he would need to be able to sit and' rest as needed. The third position was as a customer service representative at AT & T. Dr. Ledbetter approved it also, but again noted that Smith would need to be able to sit at will as needed.
On August 25, 2011, Smith underwent a second medical opinion by Dr. Sandra Weitz. Her impressions were cervical spondylosis and left, shoulder pain status post rotator cuff repair. She believed that Smith was left with only the option of medication management. She thought he was at |7maximum medical improvement, and that he needed a functional capacity evaluation (“FCE”) to define his return to work status. Her impression was that he would most likely be capable of a sedentary level job.
■ Smith, who was 74 years old at the time of the April 2015 trial, had worked for Highlines for 17 years before he was injured. When first hired at Highlines, he worked with a crew setting poles and stringing wire. He was then moved to[1] a storeroom where he loaded and unloaded transformers' with a forklift. Prior to working for' Highlines, he was employed for 17 to 18 years by Boyte Enterprises building electrical substations.
Other than working for ■ a company called Universal for one week, Smith has not worked since he was injured. Smith explained that-he still has problems with his neck, headaches, weakness in his left side, and no grip in his left hand. He also said his left arm trembles all the time, and his arm would stop working .if he tried to use it for more than 15 to 20 minutes. He cannot do’much lifting with.his left arm. Smith’s wife, Faye, testified that Smith did not have any physical restrictions on his activities before the accident, but now his left arm shakes and his lack of grip strength in his left hand limits his ability *215 to do things such as unscrew something. Faye explained that her husband sometimes drops his fork, and he has trouble gripping his coffee cup. Smith is right-handed, but primarily uses his left hand for gripping objects.
Smith testified that he could not do a job where he had to sit and answer a phone all day because he cannot hear well. He does not use the phone at home because of his hearing difficulties, so his wife has to answer |sthe- phone there. Faye deals with the medical offices and drugstores that call because Smith has poor hearing from working around heavy machinery.
Smith seldom drives his truck, and his wife usually brings him to the doctor. He explained that although Dr. Ledbetter has not told him to refrain from driving, he has enough sense to know not to drive, and he does not drive when he is unable to see. Smith could not tell the court what the two restrictions on his drivers license were despite having looked at his. license a day earlier. Faye testified that although her husband can drive short distances, she still does most of the driving.
According to Faye, Smith does not do much around the house, and is able to lift very little. He cannot wash dishes as he has already broken several cups. When she brings groceries home, he may take a box of cereal into their home.
Smith is able to mow what he referred to as his “small” yard[3] using a riding lawn mower, but he has to stop after about 5-10 minutes to take a break. It does not take him more than 25 minutes to cut his grass, which he does every other week. His grandson trims his weeds and maintains the mower.
Smith claimed that he does not take one of his prescribed drugs often because it makes him sleepy. Faye added that Smith’s medicines sometimes make him go to sleep when he sits down, and they can make him dizzy. Dr. McHugh did not think any of the drugs prescribed by Dr. |flLedbetter would have any effect on Smith’s ability to perform work activities.
Smith is able to walk without using a cane or a walker, and he walked into court without any assistance. He does not stay in bed, but gets up and moves around as recommended by Dr. Ledbetter, who encouraged him to walk and -to exercise. Faye testified that Smith sometimes needs a cane to walk.
Smith failed to complete the 8th grade. He has never had any vocational training, and he has never worked a sedentary or a clerical type job.- Faye testified that Smith has never had any training for a sedentary job. She recalled that one job required him to use a computer just to apply for it, which he could not do.
Smith did not know of any jobs that he could do, and if he could do anything, he thought that he would give out after only 10-15 minutes. He recalled that a job had been found for him several years earlier, but he was disqualified from it because he ■could not lift what was required. Faye testified that Smith applied for the jobs at AT & T and Sears, but neither she nor his job coach ever heard why he was not hired for those jobs.
Smith admitted that he can get to a job site, walk in, and sit in a chair, and can do something for a very short period of time. Faye testified that Smith cannot stand for very long because of his neck, and even if he is sitting down; he will still have to get up and walk around. She has seen him bend over and grab his neck while doing something like watching TV. She agreed *216 that if there is a job that allows a person to sit, stand, and only use hisi|jnarms occasionally, then he could work that job within his abilities, but only for a very short period of time.
Smith underwent an FCE at Guillory’s Therapy Clinic on February 7, 2014. Therapist John Guillory noted that: (i) Smith had bilateral upper extremity intention tremors more so on the left that tended to increase with maximum efforts during the upper extremity lifts; (ii) his tremors appeared to increase with the arm lift, push and pull; (iii) his use of hand control should be with very low resistance and for very short period of time; and (iv) Smith said that sometimes that type of lifting will make it hurt, and sometimes it will not, but he was pretty' sure it would hurt the next day. Guillory remarked that .Smith’s upper extremity intention tremors increased significantly with his effort during the dynamic lift portion of the test. It was Guillory’s opinion that Smith gave maximum effort throughout the .FCE, and was very pleasant and cooperative. It was also Guillory’s opinion that Smith was not suitable to return to work at that time.
Dr. McHugh believed he examined Smith for just the second time on April 17, 2014. A complete physical exam was not done; rather, it was a cursory exam.[4] Smith reported that he had continued cervical pain and upper extremity pain, numbness, and tingling, which was greater on the left, as well as lower extremity numbness and tingling, which was greater, on the left as well. Smith also reported that he could do limited activity around his home but only for short periods of time. Dr. McHugh found Smith’s cervical range óf motion tb be extremely limited. Smith’s upper extremity Instrength remained the same as in 2005. Dr. McHugh reviewed the FCE evaluation from two months earner and noted he agreed with the findings that Smith was not suitable to return to any type of gainful employment. However, in his deposition of November 11, 2014, Dr. McHugh had never asked Guillory if he meant Smith was “not suitable to return to work at this time” just in the construction industry. Dr. McHugh agreed that Smith could not return to work as a construction laborer. However, he thought Smith was capable of working a part-time sedentary job that adhered to the limits, set forth in the FCE report, that allowed him to sit or stand as needed and did not require him to lift more than 10 pounds.
Dr. Ledbetter was deposed for the first time on February 26, 2014, shortly after the FCE was done. He explained that he focused on the joints in the cervical spine when he began treating Smith. His last procedure was in April of 2013, but he continued to see Smith on about a monthly basis. Dr. Ledbetter thought Smith had a chronic pain problem, his function would not improve, and he would see a doctor indefinitely.[5] •
In regard to the FCE report, Dr. Led-better testified that he would defer to Guil-lory’s findings; however, when further questioned about Guillory’s statement regarding Smith’s unsuitability to return to work, and whether that statement per-' tained to Smith’s old job, a sedentary job, or any particular position, Dr. Ledbetter responded that he felt it probably referred *217 to Smith’s old job, but he was not certain as it could mean different things. Dr. | ^Ledbetter agreed with his earlier assessment (2011) and could not say, more probably than not, that Smith could not return to a sedentary type of job. He also testified that until,, he received clarification about what Guillory had meant, he could not say that Smith was prohibited from doing any job whatsoever. If Guillory clarified his statement and said Smith could work at a sedentary level but nothing greater than that, then Dr. Ledbetter would probably approve those limited jobs for Smith.
On May 22, 2014, Dr. Ledbetter examined Smith, who had ongoing chronic neck pain and was doing about the same. After reviewing the FGE report, Dr. Ledbetter noted that he did not believe that Smith was able to return to work. Dr. Ledbetter next saw Smith in August of 2014.
Dr. Ledbetter was deposed for a second time on November 17, 2014. He thought Smith’s condition would continue to degenerate. He had not received a clarification about what Guillory meant in the FCE report about suitability to work, but upon reviewing it, Dr. Ledbetter thought Guillo-ry meant Smith could not return to his prior job. Dr. Ledbetter opined that Smith could probably work a part-time job with sedentary restrictions as he was not prevented from any employment whatsoever.
Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551; Dombrowski v. Patterson-UTI Drilling Co., 46,249 (La.App.2d Cir.4/13/11), 63 So.3d 308. To reverse a fact finder’s determination under this standard of review, an appellate court must undertake a two-part inquiry: (1) the court must find from the record that a reasonable factual [1Rbasis does not exist for the finding of the trier of fact; and (2) the court must further determine that the record establishes that the finding is clearly wrong. Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993); Dombrowski v. Patterson-UTI Drilling Co., supra.
Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one. If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart v. State, supra; Dombrowski v. Patterson-UTI Drilling Co., supra.
Based- on our review of the evidence in this record, we cannot conclude that’ the WCJ was clearly wrong in denying Smith’s claim that he is permanently totally disabled. Smith did not show by clear and convincing evidence that he is unable to engage in any type of employment. As noted by the WCJ, the evidence shows that Smith is capable of sedentary work.

IWP Statements

Highlines contends that the WCJ erred in ordering it to pay for the prescriptions filled by IWP.
Most of the background concerning Smith’s history of obtaining medications to treat his work injury was supplied by Faye Smith, who helped her husband get his prescriptions- filled. On June 20, 2007, Gray provided Smith with a TMESYS prescription card for him to use to obtain his prescription drugs. Faye initially used Mr. Discount Drugs to fill Smith’s prescriptions, but decided to use Gray’s mail order system in 2007 |14after-Mr. Discount *218 Drugs told her that Gray would pay only one-half of the cost of the drugs. The mail order system did not work to Faye’s satisfaction because she had to call in to get the medicine refilled; as she. was working at the time, there' were often .mistakes with the order. She related that it took her about three times to get the medicines sent by mail, and by then Smith was already out of his medicine. She wanted to go to a pharmacy where she could deal with someone in person.
When she used the TMESYS card, the pharmacy would have to call Gray to verify that Smith could receive the medicine. Sometimes, Faye would have to come back the next day to pick up the medicine.
Smith received a new TMESYS card on October 28, 2009. Faye began' using City Apothecary, which she did for a year and a half, but stopped when Smith later received a newer TMESYS card that did not list City Apothecary as a provider. Faye thought it was in December of 2012 that Smith received the newest card. She decided to begin using Walgreens at that point. She could have used Mr. Discount again, but.she. did not want to do so after what had happened earlier when she was told she would have to pay for one-half the cost of the medicine.
According to Faye, Smith’s prescriptions were filled the first time she took them to Walgreens, but the second time she was not able to get them filled. By her account,. Walgreens employees told her that coverage .was denied because the case had been closed.
Faye then went to the office of Smith’s attorney, C. Daniel Street, to alert him about what had happened. He directed her to IWP since she | slacked the cash to pay for the drugs herself. Faye never contacted Gray about, the denial before going to see Street. , ;
Except for when a new nurse at Dr. Ledbetter’s office sent a prescription to Walgreens in August of 2014, Faye used exclusively IWP'to fill Smith’s prescriptions related to his work injury until April of 2015, when IWP stopped mailing them.
Faye admitted that Grayfold her that it Would not pay for the medications provided by IWP. She claimed ’that Gray called her and said that Smith’s medicines had been referred to a deferred account where he would have to pay for them if he lost the ease. She never received anything in writing directly from Gray.
On May 29, 2013, IWP faxed a request for pre-authorization to Gray. On May 30, 2013, Brenda Guillot, a claims representative with Gray, sent a fax to IWP, which stated:
As the insurers of Hoti, Inc., this office is involved in discharging that firm’s obligations to its employee, Mr. John W. Smith, regarding his injuries' allegedly sustained on the job.
On several occasions we informed Bene-ta via telephone conversation, fax, and denying your “Request for Pre-Authori-zation Form”. As we stated repeatedly, all the medications were denied as Mr. Smith would need to continue receiving them through the normal process. Furthermore, this is not a referral from The Gray Insurance Company therefore, we are not responsible in honoring your invoice(s).
Gray resent this fax to IWP in early June after it received a claim form and another request . for pre-authorization. Gray also returned the request forms with “NO” marked in the approval boxes.
On June 11, 2013, Gray received a claim form from IWP for $51.75. On June 13, 2013, Guillot sent a fax to IWP which repeated most of the | ^content of the earlier fax. In particular, it repeated that all *219 the medications were denied because Smith would need to continue receiving them through the normal process, and Gray was not responsible for honoring the submitted invoices. . Guillot would resend this fax a few days later when IWP sent her a request for pre-authorization.
On June 12, 2013, Street sent a bill for $614.95 from IWP to Guillot. On June 24, 2013, Guillot wrote to Street:'
[Pjlease allow this correspondence to put you on formal notice that The Gray Insurance Company chooses to use pharmacies and medication providers other than IWP. and will not at any time be using IWP for anything whatsoever. If IWP provides any medications to Mr, Smith, then it will be without the approval of The Gray Insurance Company and will not .be subject to payment or reimbursement and . IWP has- been placed on notice of this repeatedly. In fact, on several occasions IWP was informed verbally and through written notice of this, not only with your client. IWP is not and will not be an approved vendor of The Gray Insurance Company.
On July 8, 2013, Street sent an IWP bill for $1,178.15 to Guillot.
On July 22, 2013, Guillot wrote a letter to IWP in which she stated that Gray was putting IWP on notice that Gray chose to use pharmacies and medication providers other than IWP and would not be using IWP. Guillot further stated that if IWP provided any medications to Smith, then it would be without the approval of Gray and not subject to payment or reimbursement. Citing Sigler v. Rand,[6] the letter further stated that the right to choose a pharmacy does not belong to the employee. Guillot concluded by stating that if IWP contacted Gray for approval, thé letter served as notice 117that such calls would not be tolerated and were unnecessary, and IWP was not to contact Gray because IWP was not an approved vendor.
Between July of 2013 and March of 2015, Gray sent this same letter to IWP at least 59 times in response to claims for payment or requests for pre-authorization. Street received copies of all these letters other than one on July 23, 2013.
On May 15,, 2014, Gray wrote to Dr. Ledbetter that they were putting him on formal notice that Gray chose to use pharmacies and medication providers other than IWP and would not at any time be using IWP for anything whatsoever. Gray added that if there was. any delay or problem in obtaining medications from a pharmacy chosen by Gray,. Guillot was to. be informed by letter-as soon , as possible. If the problem could, not be remedied, then Gray would choose another pharmacy.
Whether a workers’ compensation insurer • was required to pay for medications obtained'from IWP was at issue before this court in Naron v. LIGA, 49,996 (La.App.2d Cir.9/9/15), 175 So.3d 475. The WCJ had ruled that LIGA'failed to meet its obligation under La. R.S. 23:1203(A) to furnish necessary drugs when an approved drugstore refused to fill Naron’s prescription and told him that his medication coverage had expired, as well as when LIGA refused coverage for Naron’s alternate choice of pharmacy. The WCJ also ruled that IWP was authorized to provide- pharmacy services to Naron, and their services became a necessary element in fulfillment of La. R.S. 23:1203(A).
La. R.S. 23:1203(A) provides:
|1sIn every case coming under this Chapter, the employer shall furnish all nec'es- *220 sary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal, and shall utilize such state, federal, public, or private facilities as will provide the injured employee with such neees-sary services. Medical care, services, and treatment may be provided by out-of-state providers or at out-of-state facilities when such care, services, and treatment are not reasonably available within the state or when it can be provided for comparable costs.
This court reversed the judgment ordering LIGA to pay IWP. While this court concluded that the choice of pharmacy belonged to Naron, his choice was limited by La. R.S. 23:1203(A), which stated that “[mjedical care, services, and treatment may be provided by out-of-state providers . when such care, services, and treatment are not reasonably available within the state or when it can be provided for comparable costs.” This court noted that it was clear that IWP was an out-of-state provider and the services it provided were reasonably available in Louisiana. Furthermore, this court noted that even if LIGA had violated its duty under La. R.S. 23:1203(A) when Naron was unable, to obtain his prescriptions, Naron was still bound by the constraints of that statute since IWP was an out-of-state provider.
Smith argues that there is no evidence in this record that IWP is an out-of-state provider. On the contrary, the numerous forms submitted by IWP to Gray that are in this record show Injured Workers Pharmacy, LLC, as having a Massachusetts physical address.
Applying the rationale in Naron v. LIGA, we conclude that Highlines and Gray were not obligated to reimburse IWP for the medications that it provided to Smith. Therefore, the WCJ erred in ordering Highlines and Gray to do so.
| ^Penalty and attorney fees
Implicit within the requirements of La. R.S. 23:1203(A) that the employer furnish all necessary drugs is that those drugs be supplied timely. Sigler v. Rand, supra.
Failure to provide payment of benefits will result in a penalty and attorney fees “unless the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.” La. R.S. 23:1201(F)(2).
Awards of penalties and attorney fees in workers’ compensation cases are essentially penal in nature, and are intended to deter indifference and undesirable conduct by employers and insurers toward injured employees. Iberia Medical Ctr. v. Ward, 2009-2705 (La.11/30/10), 53 So.3d 421. Penal provisions are strictly construed. Id. The WCJ’s grant or denial of penalties and attorney fees under the workers’ compensation statute is subject to manifest error review. Thomas v. Browning-Ferris Inc., 2004-1584 (La.2/25/05), 894 So.2d 1091; Tingle v. Page Boiler, Inc., 50,373 (La.App.2d Cir.1/13/16), 186 So.3d 220.
Smith contends that the choice of pharmacy issue has nothing to do with the denial of prescription drug coverage at Walgreens that prompted Smith to use IWP in the first place. We agree. Gray directed Smith to use Walgreens by listing it as one of the pharmacy providers on the TMESYS cards that Gray mailed to him. Smith did as he was told, yet he was unable to timely procure a drug prescribed to treat his workers’ compensation injury. As such, it cannot be said that Gray reasonably controverted this claim. Furthermore, because Gray failed to fill its obligation under La. R.S. |2n23:1203(A) when Smith was denied his prescription medicine at Walgreens, Gray was properly ordered to pay a penalty and attorney fees.
*221 In Naron v. LIGA, supra, the claimant used a pharmacy card provided by his insurer without any problems until the pharmacy that he had been using declined to fill his prescription because coverage had expired. The claimant’s attorney then referred him to IWP. The insurer, LIGA, paid for the first invoice that it received from IWP, but it also told IWP that the claimant was to use his pharmacy card. LIGA then refused to pay for future invoices received from IWP. In contrast, from our review of the record, it does not appear that Gray ever paid for even the prescriptions that were denied at Wal-greens.
Accordingly, the WCJ was not clearly wrong in ordering Highlines and Gray to pay a penalty of $2,000 and attorney fees of $5,000.
CONCLUSION
With each party to bear its own costs, we reverse the judgment insofar as it ordered Gray and Highlines to pay the IWP bill. In all other respects, the judgment is affirmed.
REVERSED IN PART; AFFIRMED.

. A later MRI, taken on June 24, 2010, showed fusion of the C4-5 disc space; moderate spondylosis of the remaining C3-7 levels with disc bulging or protrusion at all three levels; moderate apophyseal joint hypertrophy at C2-4; slight degenerative subluxation at the C3-4 level; cord impingement but no impressive central stenosis; moderate C4 for-aminal stenosis; and mild central stenosis at C5-7 with at least moderate bilateral forami-nal stenosis at both levels greatest on the left at C6-7. Dr. Ledbetter thought the fusion at C4-5 was from a 2005 surgery performed by Dr. McHugh.

. Dr. Ledbetter ordered physical therapy again in February of 2007 and in March of 2011.

. Smith and his wife live on an acre of land. She explained that part is fenced off from the back yard because they used to have horses when Smith was able to ride them.

. Some of the tests were stopped because of a breakdown in body mechanics.

. Dr. Ledbetter thought in May of 2007 that Smith had reached maximum medical improvement, although he would need periodical trigger point injections of the neck and upper back areas, as well as repeat cervical facet radiofrequency neurotomies.

. Sigler v. Rand, 2004-1138 (La.App. 3 Cir. 12/29/04), 896 So.2d 189, writ denied, 2005-0278 (La.4/1/05), 897 So.2d 611.